# EXHIBIT A

# Docket No. 1

**CRONIN, FRIED, SEKIYA,**
  **KEKINA & FAIRBANKS**
L. Richard Fried, Jr.          0764-0
Patrick F. McTernan        4269-0
510 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 524-1433
rfried@croninfried.com
pmcternan@croninfried.com

Attorneys for Plaintiff

Electronically Filed
FIRST CIRCUIT
1CCV-25-0001484
05-SEP-2025
03:41 PM
Dkt. 1 CMPS

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | | |
|---|---|---|
| STATE OF HAWAIʻI, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL, | ) ) ) | CIVIL NO. _____ (Other Civil Action) |
| Plaintiff, | ) ) | COMPLAINT; SUMMONS |
| vs. | ) ) ) | |
| EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC; and OPTUM HEALTH NETWORKS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff State of Hawai'i *ex rel.* Anne E. Lopez, Attorney General ("State" or "Plaintiff"), brings this Complaint against Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc. (formerly Express Scripts Holding Company), and Express Scripts Specialty Distribution Services, Inc. **(collectively, "Express Scripts");** and UnitedHealth Group, Inc., Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc. **(collectively "Optum")**. Together, Express Scripts and Optum are referred to herein as **"the PBM Defendants."**  The State alleges as follows:

## I.    INTRODUCTION

1.    This case arises out of the worst man-made epidemic in modern medical history— the misuse, abuse, diversion, and over-prescription of opioids—which has ravaged every state in the nation, including the State of Hawai'i.

2.    The opioid epidemic was created and sustained by a wide array of actors in the opioid supply and payment chain: opioid manufacturers, distributors, and pharmacies, as well as Pharmacy Benefit Managers ("PBMs"). The role of Express Scripts and Optum—two of the nation's three largest PBMs—in stoking the opioid epidemic was, until recently, largely concealed from public scrutiny. It has now become clear that the PBM Defendants have, for at least the last two decades, played a critical role in facilitating the oversupply of opioids through conduct that was intended to increase prescribing, dispensing, and sales of prescription opioids in the State of Hawai'i.

2

3.     The State files this Complaint under the Hawaiʻi Unfair and Deceptive Acts or Practices statute ("UDAP"), Chapter 480, Hawaiʻi Revised Statutes ("HRS"), HRS § 661-10, Hawaiʻi Uniform Controlled Substances Act ("HUCSA"), HRS § 329-32, -33, and Hawaiʻi common law and principles of equity, to hold Express Scripts and Optum accountable for the central role they played in the opioid epidemic.

4.     The PBM Defendants' role in the opioid epidemic was made possible by their unique combination of knowledge and market power that gave them an extraordinary ability to influence the use and availability of prescription opioids and track the opioid epidemic, pill by pill, as it unfolded for over twenty years.

5.     The following chart illustrates the central role the PBM Defendants play in the prescription drug market:[1]



---

[1] *What Pharmacy Benefit Managers Do, and How They Contribute to Drug Spending*, The Commonwealth Fund (March 17, 2025),

In short, the PBM Defendants sit at the center of prescription drug dispensing because they contract with the manufacturers who make the drugs, the pharmacies who dispense them, and the third-party payors who pay for them.

6.      The PBM Defendants' conduct that contributed to the oversupply of opioids included, but is not limited to: (a) colluding with, and aiding and abetting, Purdue Pharma L.P. and its affiliates ("Purdue") and other opioid manufacturers in the fraudulent and deceptive marketing and oversupply of opioids; (b) colluding with Purdue and other opioid manufacturers to increase opioid sales; (c) colluding with Purdue and other opioid manufacturers to eliminate or limit utilization management measures on national drug lists, such as quantity limits and prior authorization, that would have restricted opioid prescribing; (d) deliberately failing to implement effective drug utilization review measures to control opioid misuse after undertaking to do so; (e) electing not to act on the vast stores of information they had about the epidemic to limit the flood of opioids into communities across the United States, including in Hawai'i; and (f) dispensing huge quantities of prescription opioids through their mail order pharmacies without proper controls against diversion, as required by HUCSA.[2]

7.      By their conduct described herein relating to prescription opioids, the PBM Defendants also created a public nuisance that continues to annoy, injure, and/or disturb the public's health, morality, use of property, and other legal rights, as well as otherwise devastate the people of Hawai'i economically, socially, emotionally, and spiritually.

---

https://www.commonwealthfund.org/publications/explainer/2025/mar/what-pharmacy-benefit-managers-do-how-they-contribute-drug-spending (last accessed 8/1/25).

[2] Opioids are regulated as Schedule II controlled substances under both Hawai'i and federal law. HUCSA, the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, or their respective implementing regulations, require all registrants to provide "effective controls" against the diversion of controlled substances. *See* HRS § 329-32, -33; HRS § 329-33(a)(1); 21 U.S.C. § 823(a)(1), (b)(1); and 21 C.F.R. § 1301.71(a).

8.      The impact of the PBM Defendants' scheme to misinform and deceptively promote the use of opioids is evidenced by the number of prescription opioids in Hawaiʻi. Opioid prescription rates in Hawaiʻi rose steadily from 2006, reaching 50.4 prescriptions for every 100 Hawaiʻi residents in 2012.  Two counties (Hawaiʻi and Kauai) regularly exceeded the national average.  As late as 2017, there were nearly 490,000 dispensed prescriptions for oxycodone and hydrocodone in Hawaiʻi, potentially consumed by one-third (34.1%) of the resident population.[3]

9.      The PBM Defendants' conduct has led to severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction, overdose, and death. The resulting costs were, and continue to be, borne by the State of Hawaiʻi.

10.      Opioid addiction and abuse result in increased emergency room visits, inpatient hospitalizations, the administration of naloxone—a medication used to counter the effects of an opioid overdose—by emergency medical services, and fatal overdoses.  For example, from 2010 through 2017, there were 3,056 hospital-treated nonfatal opioid poisonings among Hawaiʻi residents.  From 2012 to 2017, emergency medical services administered naloxone to 7,671 patients.  In 2017, the estimated cost of each opioid-related overdose was $4,050 per emergency department visit and $40,100 for each hospitalization.[4]  Moreover, between 2012 and 2016, an average of 150 Hawaiʻi residents died every year from a drug overdose—roughly 33% more than

---

[3]  https://health.hawaii.gov/substance-abuse/files/2013/05/The-Hawaii-Opioid-Initiative.pdf  (last accessed 8/1/25).

[4]  https://health.hawaii.gov/substance-abuse/files/2013/05/The-Hawaii-Opioid-Initiative.pdf  (last accessed 8/1/25).

all deaths attributable to motor vehicle crashes.[5]  In 2018, it was reported that one in five deaths among young adults in Hawaiʻi were opioid-related.[6]

11.    Most overdoses from non-prescription opioids directly relate to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, turn to heroin and fentanyl. According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription opioids which, at the molecular level and in their effect, closely resemble heroin. The predictable shift from prescription opioids to illicit opioids—heroin and fentanyl in particular—in Hawaiʻi has proven deadly.

12.    As illustrated in the chart below, after increasing marginally between 1999 and 2016, the total number of opioid-related fatal overdoses in Hawaiʻi skyrocketed between 2019 and 2023.  Moreover, in 2023, the number of fentanyl-related overdose deaths in Hawaiʻi rose to 107, a 35% increase from 2022.[7]



---

[5] *Id.*

[6]    https://www.hawaiipacifichealth.org/healthier-hawaii/news/examining-the-growing-opioid-overuse-trend-in-hawaii/ (last accessed 8/1/25).

[7]    https://www.hawaiinewsnow.com/2024/05/14/drug-overdose-deaths-up-maui-county-kauai-fentanyl-use-grows/ (last accessed 8/1/25).

13.     The burdens imposed on the State of Hawaiʻi are not the normal or typical burdens of governmental programs and services. Rather, these are unprecedented and extraordinary costs and losses that were legally caused by the PBM Defendants' illegal conduct in Hawaiʻi. Meanwhile, the PBM Defendants continue to enjoy record profits.

14.     Accordingly, for violations of UDAP, HUCSA, Hawaiʻi common law, and principles of equity, the State seeks: (1) civil penalties against the PBM Defendants for their unfair and deceptive acts and practices; (2) disgorgement of the PBM Defendants' ill-gotten gains; (3) damages and injunctive relief for abatement of the public nuisance and other harms the PBM Defendants created; (4) treble damages; and (5) injunctive and declaratory relief to prevent the PBM Defendants from engaging in such misconduct in the future.

## II.     JURISDICTION AND VENUE

15.     This Court is a court of general jurisdiction with authority to preside over civil actions and proceedings such as this pursuant to HRS § 603-21.5(a)(3), as well as actions for penalties such as this pursuant to HRS § 603-21.5(a)(2).  The State has standing to bring this action under HRS §§ 661-10, 480-2, 480-3.1, 480-13.5, 480-14(a), 480-15, and other applicable Hawaiʻi law including, but not limited, to the *parens patriae* doctrine.

16.     The PBM Defendants are subject to personal jurisdiction in this Court pursuant to HRS § 634-35(a) and (b) because the causes of actions asserted herein arose from the PBM Defendants' transaction of business in Hawaiʻi and commission of tortious acts in and/or directed toward Hawaiʻi, including in the City and County of Honolulu, State of Hawaiʻi.

17.     The instant Complaint does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332, as the State is not a citizen of any state and this action is not subject to the jurisdiction of the Class Action Fairness Act of 2005.

18.     The State does not bring this action on behalf of a class or any group of persons that can be construed as a class under 28 U.S.C. § 1332(d)(1), 28 U.S.C. § 1332(d)(11), 28 U.S.C. § 1454, Rule 23 of the Hawaiʻi Rules of Civil Procedure, or otherwise.  The claims asserted herein are brought solely by the State and are wholly independent of any claims that individual users or consumers of opioids may have against the PBM Defendants. The State expressly disavows that it is bringing or attempting to bring a class action under any theory or authority.

19.     Likewise, this Complaint does not invoke federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as it exclusively sets forth state law claims against the PBM Defendants.  Nowhere herein does the State plead, expressly or implicitly, any cause of action or request any remedy that arises under federal law.  The issues presented in this Complaint do not turn on the interpretation of federal law, much less implicate any "*substantial* federal question of … law." *State of Hawaiʻi ex rel. Louie v. Bristol-Myers Squibb Co.*, 2014 WL 3427387 *15-*16 (D. Haw. July 15, 2014) (emphasis added). The Complaint does not implicate any issue important to the federal system as a whole under the criteria in *Gunn v. Minton*, 568 U.S. 251 (2013) (*e.g.*, federal tax collection seizures, federal government bonds).  Specifically, the causes of action asserted herein, and the remedies sought, are founded only upon the positive statutory, common, and decisional laws of the State of Hawaiʻi.  Indeed, the assertion of federal jurisdiction over the claims made herein would improperly disturb the congressionally-approved balance of federal and state responsibilities.

20.     Removal pursuant to the federal officer removal statute, 28 U.S.C. § 1442, would likewise be improper.  The claims asserted herein do not implicate any act taken "under color" of a federal officer.  *See, e.g.*, *Bd. of Commissioners of Boulder Cty. v. Suncor Energy (USA), Inc.*, 965 F.3d 792, 821-824 (10th Cir. 2020), *rev'd on other grounds*, 141 S. Ct. 2667 (2021). Moreover,

the alleged injury could not have happened under the direction of a federal officer. *State of Hawai'i ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, No. CV 23-00464 LEK-RT, 2025 WL 1218598 at *10 (D. Haw. Apr. 28, 2025) (citing *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 187 (1st Cir. 2024)). Accordingly, federal jurisdiction over this Complaint is lacking.

21.    The State brings this action exclusively under the laws of the State of Hawai'i.  No federal claims are asserted, and to the extent that any claim or factual assertion herein could be construed to state a claim for relief under federal law, the State expressly and undeniably disavows and disclaims such claim. This Complaint's citations to federal statutes and regulations are only to state the duties owed under Hawai'i law, and do not allege an independent federal cause of action or any substantial federal question under *Gunn v Minton*. Thus, removal of this Complaint based on an imagined federal cause of action or substantial federal question would be improper.

22.    This action is solely based on state law and relates to the PBM Defendants' unlawful conduct that has created, perpetuated, contributed to, and maintained, a serious public health crisis of opioid abuse, addiction, morbidity, and mortality throughout the State. The PBM Defendants must be held accountable to abate the public nuisance they have created across Hawai'i. This lawsuit does not seek damages related to the federal government or for conduct undertaken pursuant to contracts with the federal government, nor does it challenge the creation of custom drug lists for, or on behalf of, a federal agency or federal officer, such as for any Federal Employees Health Benefits Act ("FEHBA") plans, or with the Department of Defense to manage TRICARE-governed health benefits plans, any Veterans Health Administration plans, or any other federal plan.  Furthermore, this lawsuit does not seek to recover monies paid by the federal government pursuant to such plans. As such, the Complaint does not seek relief from any PBM Defendant that is available pursuant to any claim(s) involving a federal government agency,

federal officer, or federal government contracting officer associated with any FEHBA or TRICARE-governed health benefits plan or federal health insurance program; nor pharmacy care services provided to the federal government; nor remedies for conduct relating to any federal plan, **including but not limited** to any remedies that would interfere with or affect the permitted drug lists, utilization management policies and programs, or administration of any Federal Plan; the uniform administration of the TRICARE program or the provision of healthcare services to U.S. military service members, veterans, and their beneficiaries; or services provided under a contract that requires the exclusive use of any federal government drug list, including the Department of Defense's Uniform Formulary, that specifies the drugs authorized, sets requirements for prior authorization and utilization reviews, and/or assures medical necessity, clinical appropriateness and/or cost-effectiveness, and/or establishes a prescription restriction program for TRICARE federal health insurance program members and/or beneficiaries.

23. This lawsuit does not contain claims against the PBM Defendants that are federal in character related to prescriptions adjudicated or processed under any federal program or federal contract, including OptumRx's contract with the Veterans Health Administration or pharmacy care services provided to the federal government, Express Scripts' contracts with the U.S. Department of Defense, the TRICARE health care program, and other FEHBA health plans overseen or administered by the federal government; nor does it include requests for relief governed by, or available pursuant to claims associated with any FEHBA or TRICARE-governed health benefits plan; nor claims against the PBM Defendants involving beneficiaries under federal healthcare programs or federal plans; nor federal prescription claims adjudicated or processed for plans controlled or sponsored by federal government agencies or entities or those processed according to a federal drug list design or Medicare Part D plans; nor conduct as a fiscal intermediary on

behalf of the federal government; nor conduct governed or managed by a federal officer or federal government contracting officer, or basic governmental tasks fulfilled or carried out by a PBM Defendant on behalf of the federal government; nor determinations as to the appropriateness of restrictions on a TRICARE member's prescriptions, which are to be determined by a federal officer; nor conduct considered to be undertaken by any PBM Defendant as a statutorily authorized alter ego of the federal government; nor any contract that provides and/or requires federal government subjection, guidance, and/or control over a PBM Defendant's performance and/or the prescription drugs included in permitted drug lists. The State further disclaims any claims regarding: 1) conduct related to prescription claims for federal plans that may or may not have caused an oversupply of prescription opioids or caused or contributed to the harms for which the State seeks recovery; 2) Express Scripts' pharmacy benefits management or mail order work for the Department of Defense under any TRICARE Contract and pertaining to health plans under FEHBA, including the operation of mail order pharmacies in accordance with contractual guidelines set by the federal government; and 3) OptumRx's work for the Veterans Health Administration and/or the federal government.

24. If and to the extent the PBM Defendants contend they negotiate the terms of contracts for both federal and non-federal programs together, the PBM Defendants do so for their own convenience and not as the result of any direction by the federal government or any federal officer.

25. The State disavows any cause of action or claim for recovery related to opioids distributed to military personnel, veterans, federal customers or health plan beneficiaries under the authority or direction of a federal officer, federal agency, or pursuant to any federal contract; or any statutory mandate to provide health care to beneficiaries of federal plans, military personnel

or veterans and/or their beneficiaries through the TRICARE federal health insurance program; contracts pertaining to pharmacy benefit management and mail order pharmacy services for federal employees, including under the TRICARE Home Delivery/Mail Order Pharmacy, or programs such as Meds by Mail; or federal contracts where a federal officer or agency directed or exercised guidance and control over the PBM Defendants' conduct as described generally in this lawsuit; the operation or management of a TRICARE mail order pharmacy; or federal contracts pertaining to dispensing by mail order pharmacies to beneficiaries of federal plans, military personnel or veterans and/or their beneficiaries; or prescription claims under a contract between the PBM Defendants and the federal government.

26.     The State expressly disclaims and disavows any and all federal claims or questions related to opioids at issue in this lawsuit and disavows any cause of action or claim for recovery related to opioids at issue that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. § 1442(a)(1) (federal officer). The State is not seeking relief for any claims for damages against any PBM Defendant whose conduct, whether by omission or commission, was at the behest of the United States or any agency or person acting under it or under color of such office to the extent that such a claim would implicate federal court jurisdiction under 28 U.S.C. § 1442(a)(1), predicated on preemption by the TRICARE statute and the FEHBA or the government contractor's defense articulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1998). The State does not assert, and hereby expressly and preemptively disclaims, all such claims that legitimately implicate such defenses, in the unlikely event that they exist and are factually supported. The State hereby puts every PBM Defendant who may nonetheless assert such defenses as a basis for federal jurisdiction over this case on notice that the State seeks no recovery for injuries as a result of conduct that meets *Boyle*'s three-prong test and

constitutes action of a federal officer sufficient to trigger jurisdiction under 28 U.S.C. § 1442(a)(1). The State specifically advises the PBM Defendants of its position that such an express, clear, and unequivocal disclaiming of injuries and of claims implicating the *Boyle* defense, as well as any other claims that legitimately implicate 28 U.S.C. § 1442(a)(1), renders any potential future removal of this case to federal court on one of these clearly-disclaimed bases objectively unreasonable under *Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005). Nor would the PBM Defendants have any colorable defense because the State's claims do not involve federal programs or federal actors.

27.     Venue is properly in this Court pursuant to HRS §§ 661-10 and 480-21(b), for reasons including, but not limited to, the fact that the Office of the Attorney General and the seat of the State Government are situated in the City and County of Honolulu, State of Hawai'i, and the claims for relief asserted herein arose, in large part, in the City and County of Honolulu, State of Hawai'i.

## III.    PARTIES

### A.    PLAINTIFF

28.     The State of Hawai'i is a body politic created by the Constitution and laws of the State; as such, it is not a citizen of any state.  This action, brought by the State in its sovereign capacity by and through Anne E. Lopez, the Attorney General of the State of Hawai'i, is authorized under HRS §§ 661-10, 480-2, 480-3.1, 480-14(a), 480-15, and other applicable Hawai'i law.  The Attorney General has the power to bring these claims on behalf of the State under the aforementioned laws.  This action is also brought by the State under its *parens patriae* authority to protect the health and well-being of its citizens.

B.     **THE PBM DEFENDANTS**

1.     **The Express Scripts Defendants**

29.     **Defendant Evernorth Health, Inc.** (f/k/a Express Scripts Holding Company) ("Evernorth") is a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri 63121.

30.     Evernorth is the parent company to all of the Express Scripts entities named as Defendants. Evernorth, through its executives and employees, controls the enterprise-wide policies that inform all of Express Scripts' lines of business in order to maximize profits across the corporate family.

31.     Evernorth's conduct had a direct effect in Hawai'i.

32.     **Defendant Express Scripts, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth with its principal place of business located at 1 Express Way, St. Louis, Missouri 63121.

33.     Express Scripts, Inc. is registered to do business in Hawai'i as a PBM and may be served through its registered agent: CT Corporation System, 900 Fort Street Mall, Suite 1680, Honolulu, Hawai'i 96813.

34.     Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Hawai'i and that engaged in the conduct which gives rise to this Complaint.

35.     During the relevant time period, Express Scripts, Inc. was directly involved in the PBM and mail order services businesses, including with respect to prescription opioids, as well as in Express Scripts' data and research services.

14

36.     **Defendant Express Scripts Administrators, LLC** is a Delaware limited liability company and wholly owned subsidiary of Evernorth with its principal place of business located at the same location as Express Scripts, Inc.

37.     Express Scripts Administrators, LLC may be served through its principal place of business.

38.     During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Hawai'i that are alleged in this Complaint.

39.     **Defendant Medco Health Solutions, Inc.** (f/k/a Merck-Medco) ("Medco") is a Delaware Corporation and wholly owned subsidiary of Evernorth with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey 07417. Medco Health Solutions, Inc. was previously known as Merck-Medco. Merck-Medco was acquired in the early 1990s by Merck & Co. as its PBM subsidiary. In 2002, Merck & Co. spun off Merck-Medco into a publicly traded company, Medco.

40.     Medco Health Solutions, Inc. is registered to do business in Hawai'i and may be served through its registered agent: CT Corporation System 900 Fort Street Mall, Suite 1680, Honolulu, Hawai'i 96813.

41.     **Defendant ESI Mail Order Processing, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth with its principal place of business located at 600 North Hanley Road, Suite D, St. Louis, MO 63134-2715.

42.     ESI Mail Order Processing, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

43.    During the relevant time period, ESI Mail Order Processing, Inc. provided the mail order pharmacy services in Hawaiʻi alleged in this Complaint.

44.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and wholly owned subsidiary of Evernorth with its principal place of business located at the same location as Express Scripts, Inc.

45.    ESI Mail Pharmacy Service, Inc. is registered to do business in Hawaiʻi and may be served through its registered agent: CT Corporation System, 900 Fort Street Mall, Suite 1680, Honolulu, Hawaiʻi 96813.

46.    ESI Mail Pharmacy Service, Inc. d/b/a Express Scripts currently holds multiple active licenses with the Hawaiʻi Board of Pharmacy and is registered with the DEA to dispense controlled substances, including prescription opioids.

47.    During the relevant time period, ESI Mail Pharmacy Service, Inc. provided the mail order pharmacy services in Hawaiʻi alleged in this Complaint.

48.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and a wholly owned subsidiary of Evernorth with its principal place of business located at the same location as Express Scripts, Inc.

49.    Express Scripts Pharmacy, Inc. is registered to do business in Hawaiʻi and may be served through its registered agent: CT Corporation System, 900 Fort Street Mall, Suite 1680 Honolulu, Hawaiʻi 96813.

50.    Express Scripts Pharmacy, Inc. d/b/a Express Scripts currently holds multiple active licenses with the Hawaiʻi Board of Pharmacy and is registered with the DEA to dispense controlled substances, including prescription opioids. During the relevant time period, Express

Scripts Pharmacy, Inc. provided the mail order pharmacy services in Hawaiʻi, alleged in this Complaint.

51.    Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. are referred to herein collectively as "Express Scripts Mail Order Pharmacy."

52.    In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States with revenues from prescriptions exceeding $54 billion.

53.    From 2006 to 2019, nationally, Express Scripts Mail Order Pharmacy purchased over 26.9 billion Morphine Milligram Equivalents ("MMEs")[8] of opioids spread over 1.3 billion opioid dosage units, according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").

54.    **Defendant Express Scripts Specialty Distribution Services, Inc**. is a Delaware corporation and wholly owned subsidiary of Evernorth with its principal place of business located at the same location as Express Scripts, Inc.

55.    Express Scripts Specialty Distribution Services, Inc. is registered to do business in Hawaiʻi and may be served through its registered agent: CT Corporation System, 900 Fort Street Mall, Suite 1680 Honolulu, Hawaiʻi 96813.

56.    Express Scripts Specialty Distribution Services, Inc. holds an active license with the Hawaiʻi State Board of Pharmacy and is registered with the DEA to dispense controlled substances, including prescription opioids.

---

[8] MME is a value that represents the potency of an opioid dose relative to morphine. To calculate the MME for a particular opioid, one multiplies the strength of the opioid per unit (*e.g.*, milligrams per tablet) by both the number of units and an opioid-specific conversion factor that accounts for its relative potency compared to morphine. This allows healthcare professionals to express a total daily opioid dose in a single, comparable unit.

17

57. During the relevant time period, Express Scripts Specialty Distribution Services, Inc. worked directly with Purdue, Endo Pharmaceuticals ("Endo"), and other opioid manufacturers to expand the prescription opioid market, including administering and dispensing opioids through Patient Assistance Programs, including in Hawai'i.

58. Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts Specialty Distribution Services, Inc., including all predecessor and successor entities, are referred to herein as "Express Scripts."

59. Express Scripts is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail order pharmacy. During the relevant time period, Express Scripts contracted directly with the opioid manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in Hawai'i.

60. In 2012, Express Scripts acquired Medco in a $29 billion deal.

61. Prior to 2012, Express Scripts and Medco were separate companies. Standing alone, these companies had been two of the largest PBMs in the United States since at least the mid-1990s. As a result of the merger, the combined Express Scripts was formed and became the largest PBM in the nation.

62. Following the merger, all of Medco's PBM and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's clients becoming Express Scripts' clients and Medco's top executives becoming Express Scripts executives.

63.　　In 2019, Express Scripts merged with Cigna, Inc. ("Cigna"). Prior to merging with Cigna, Express Scripts was the largest independent PBM in the United States.

64.　　The following chart represents the consolidation of PBM entities that comprise Express Scripts today:



65.　　Express Scripts provides pharmacy benefit services to more than 100 million Americans, filling 1.4 billion prescriptions per year.

66.　　Express Scripts provided PBM services and maintained various standard, national drug lists that were used by Express Scripts' clients, including large national companies and local/regional businesses, and prescription drug benefit plans in Hawaiʻi throughout the relevant time period.

67.　　In Hawaiʻi, Express Scripts (and/or its predecessors) processed claims for opioids dispensed pursuant to Express Scripts' national guidelines and drug lists throughout the opioid epidemic.

### 2.　　The Optum Defendants

68.　　**Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, MN, 55343.

69.     UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

70.     UnitedHealth Group is a Fortune 5 diversified managed healthcare company. In 2022, UnitedHealth Group reported revenue in excess of $324 billion. UnitedHealth Group offers a spectrum of products and services, including health insurance plans and pharmacy benefits through its wholly owned subsidiaries.

71.     UnitedHealth Group operates through two connected divisions—Optum and UnitedHealthcare ("UHC"). As discussed in greater detail herein, Optum provides PBM services; mail order pharmacy services; and data, analytics, consulting, and research services. UHC provides health insurance and health benefit services. In 2022, UHC insured over 46 million Americans and generated $249 billion in revenue.

72.     UnitedHealth Group, through its executives and employees, controls the enterprise-wide policies that govern both UHC's and Optum's lines of business in order to maximize profits across the corporate family.

73.     UnitedHealth Group's conduct had a direct effect in Hawaiʻi.

74.     **Defendant Optum, Inc**. is a corporation organized under the laws of Delaware with its principal place of business located at 11000 Optum Circle, Eden Prairie, Minnesota 55344.

75.     Optum, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

76.     Optum, Inc. is a health services company managing the subsidiaries that administer UnitedHealth Group's pharmacy benefits, including OptumRx, Inc.

77.     Since 2005, Optum, Inc. has been a part of the UnitedHealth Group.

78.     Optum, Inc. is engaged in five types of business activities: (1) data analytics; (2) pharmacy benefit management; (3) healthcare services; (4) mail-order pharmacy dispensing; and (5) medical discount card services.

79.     **Defendant OptumInsight, Inc.** (f/k/a Ingenix, Inc.) is a Delaware corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55343. OptumInsight was formerly known as Ingenix. The name change occurred after the State of New York investigated Ingenix related to a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State of New York and giving rise to U.S. Congressional hearings.

80.     OptumInsight, Inc. is registered to do business in Hawaiʻi and may be served through its registered agent: CT Corporation System, 900 Fort Street Mall, Suite 1680, Honolulu, Hawaiʻi 96813.

81.     **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation with its principal place of business located at 640 George Washington Highway, Lincoln, Rhode Island 02865.

82.     OptumInsight Life Sciences, Inc. is a wholly-owned subsidiary of UnitedHealth Group. Prior to 2011, OptumInsight Life Sciences, Inc. was known as QualityMetric.

83.     OptumInsight Life Sciences, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

84.     OptumInsight, Inc. and OptumInsight Life Sciences, Inc., as well as their predecessors, successors, and affiliates, including a collection of entities acquired by UnitedHealth

Group over time (Ingenix, Innovus, Innovus Research, i3, QualityMetric, HTAnalysts, ChinaGate, Lewin Group, and CanReg) are referred to herein as "OptumInsight."



85.    OptumInsight is an integral part of the conduct that gave rise to the State's causes of action. Throughout the relevant time period, OptumInsight worked directly with opioid manufacturers to expand the opioid market throughout the United States and in Hawai'i. OptumInsight partnered with various opioid manufacturers to create studies, marketing, educational programs, and even identify algorithms to simultaneously downplay the addictive properties of prescription opioids and expand their use and availability throughout the country, including in Hawai'i.

86.    Each opioid manufacturer had dedicated executives assigned to work with OptumInsight.  The opioid manufacturers used their relationships to expand and strengthen the ties with UHG and the overall Optum family.

87.    OptumInsight was paid tens of millions of dollars by opioid manufacturers during the relevant time period for its work to expand the opioid market.

88.    OptumInsight, Optum's data, research, and consulting arm, is one of the largest health information, technology, and consulting companies in the world. It collects, processes, sells, and profits from the vast data for all of its managed lives which, in 2011, was more than 75 million. OptumInsight also provides clinical research, consulting, marketing advisory services, and analytics tools to its clients.

89.    OptumInsight analyzed data and other information concerning opioid prescription claims data and health plans' opioid utilization for use in its research and consulting efforts in coordination with opioid manufacturers' efforts to expand the opioid market and increase opioid utilization nationwide, including in Hawaiʻi.

90.    **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main Street Irvine, California, 92614. OptumRx is the arm of Optum that provides PBM and pharmacy dispensing services.

91.    OptumRx is registered to do business in the State of Hawaiʻi and may be served through its registered agent: CT Corporation System, 900 Fort Street Mall, Suite 1680 Honolulu, Hawaiʻi 96813.

92.    OptumRx currently holds multiple active licenses with the Hawaiʻi Board of Pharmacy and is registered with the DEA to dispense controlled substances, including prescription opioids.

23

93.     Prior to 2011, OptumRx was known as Prescription Solutions. In addition, as depicted in the Consolidation chart below, OptumRx grew as a result of numerous mergers and acquisitions. For example, in 2012, a large PBM, SXC Health Solutions, bought one of its largest rivals, Catalyst Health Solutions Inc., in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company Catamaran Corp. ("Catamaran").  Thereafter, UHG bought Catamaran in a deal worth $12.8 billion and merged Catamaran with OptumRx.

94.     Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran engaged in the at-issue PBM and mail order activities alleged in this Complaint.

95.     OptumRx now provides both PBM and mail-order dispensing services. At all relevant times, OptumRx provided PBM services to a variety of health insurance plan sponsors, including large national companies and local/regional businesses, with individual plan members in Hawai'i.

96.     At all relevant times, OptumRx has sold and continues to sell prescription opioids through its mail order pharmacies in Hawai'i.

97.     OptumRx and all of its predecessors, including but not limited to Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran are referred to herein as "OptumRx."

98.    The consolidations that led to the emergence of OptumRx in its current form are shown on the chart below:



99.    **Defendant OptumHealth Care Solutions, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344.

100.    OptumHealth Care Solutions, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

101.    OptumHealth partnered with Purdue to "educate" case managers, nurse practitioners, and medical directors throughout UnitedHealth Group's various enterprises. These programs were specifically endorsed and coordinated through one of Optum Health's national medical directors. The content of these programs targeted pain as an undertreated disease, among other issues, and contained the similar dangerous messaging regarding the use of OxyContin that led to Purdue's guilty plea in 2007.

102.    **Defendant OptumHealth Holdings, LLC** is a Delaware limited liability company with its principal place of business at 11000 Optum Cir., Eden Prairie, Minnesota 55344 and may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

103.    **Defendant OptumHealth Networks, Inc.** is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.

104.    OptumHealth Networks, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

105.    OptumHealth Networks, Inc. provides care services to enrolled members of its subsidiaries and parents that includes care management services, arranging for delivery of services, and managing client relationships and contracts for access to said services.

106.    Together, OptumHealth Care Solutions, LLC, OptumHealth Holdings, LLC, and OptumHealth Networks, Inc. are referred to herein as "OptumHealth."

107.    OptumHealth is a healthcare service provider that includes specialty health services, health banking services, ancillary care networks, and health education and information services to both individuals and health care professionals. It does this through four main lines of business: Care Solutions, Behavioral Solutions, Specialty Benefits, and Financial Services. In 2022, OptumHealth served 102 million individuals.

108.    Relevant to the opioid epidemic and the State's claims, OptumHealth partnered with Purdue throughout the 2000s to create programs that purported to "educate" healthcare providers in Hawai'i and the rest of the country regarding the alleged "undertreatment" of pain. As discussed *infra*, these programs were specifically endorsed and coordinated through one of OptumHealth's national medical directors. These programs falsely suggested, *inter alia*, that pain was an "undertreated disease," as well as contained the dangerous messaging regarding the use of OxyContin that resulted in Purdue's 2007 guilty plea.

26

109.    Collectively, OptumRx, Optum, Inc., OptumHealth Care Services, LLC, OptumHealth Holdings, LLC, OptumHealth Networks, Inc., and OptumInsight are referred to herein as "Optum."

110.    Optum is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, consulting, and research provider; and (3) mail order pharmacy. During the relevant time period, Optum contracted directly with the opioid manufacturers in each of these capacities. At all relevant times, Optum performed these services and derived substantial revenue in Hawaiʻi.

111.    Optum, Inc. is a health services company comprising three sectors—OptumRx, which manages pharmacy benefits for both UHC and third party clients; OptumHealth, which provides medical services and education and support for individuals throughout the country; and OptumInsight, which is the data, research, and consulting sector.

112.    OptumRx is the third largest PBM in the United States. It provides PBM services to more than 65 million people.

113.    At all times relevant hereto, OptumRx provided PBM services and maintained various standard, national drug lists that were used by OptumRx's clients, including large national companies, local/regional businesses, and prescription drug benefit plans in Hawaiʻi. At all times relevant hereto, those lists included prescription opioids, including those at issue in this Complaint.

114.    Optum (and/or its predecessors) processed claims for prescription opioids dispensed pursuant to Optum's standard, national drug lists and utilization management guidelines in Hawaiʻi throughout the ongoing opioid epidemic.

115.    In addition to its pharmacy benefit services, Optum entities also provide services related to pharmaceutical reimbursement and dispensing that generate revenue and benefit from a lack of opioid controls.

27

116.    At all times relevant hereto, Optum offered mail-order pharmacy services and dispensed opioids in Hawai'i.

117.    In 2021, Optum's mail order pharmacy was the fourth largest dispensing pharmacy in the United States and reported $34.2 billion in prescription revenues.

118.    From 2006 to 2019, nationally, Optum's mail order pharmacy purchased over 8.1 billion MMEs of opioids spread over 252 million opioid dosage units, according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").

## IV.    FACTUAL ALLEGATIONS

### A.    The PBM Defendants' Role in Causing the Opioid Crisis

119.    The PBM industry has become increasingly consolidated and powerful over the past several years. As the chart below reflects, as of 2023, all major health insurers had vertically integrated with their own PBM subsidiaries.



120.    As a result of numerous mergers and acquisitions, as of 2023, just three PBMs controlled 80% of the prescription drug market, with each of the big three PBMs bringing in billions of dollars of revenue annually.[9]

121.    The PBM Defendants are: (1) two of the three largest PBMs in the United States, collectively managing prescription drug coverage for 160+ million covered lives and processing more than 1.5 billion claims per year; (2) two of the top five dispensing pharmacies in the United States; (3) owned by two of the largest insurance companies in the world (UnitedHealth Group and Cigna); and (4) among the largest healthcare data, consulting, and analytics companies in the United States.

122.    Controlling prescription drug benefits for 160+ million Americans, the PBM Defendants are in possession of detailed information about every prescription they process, regardless of which company manufactured the drug, which doctor prescribed it, or which pharmacy filled it. They know when patients whose benefits they manage fill opioid prescriptions written by multiple doctors, and when they fill them at multiple pharmacies. They know how many times every opioid prescription they cover is refilled and they know when a patient who was prescribed opioids is later treated with medication for substance use disorder. They know if a patient under their plan is having prescriptions filled for opioids, benzodiazepines, and sleep aids concurrently, creating so-called "drug cocktails." In short, the PBM Defendants have had a unique vantage point on opioid use and prescribing patterns and associated opioid misuse.

---

[9] Arthur Allen, *What to know about the drug price fight in those TV ads*, Shots - Health News from NPR (July 7, 2023), https://www.npr.org/sections/health-shots/2023/07/07/1186317498/pharmacy-benefit-manager-pbm-ads-congress (last accessed 8/1/2025).

123.    The PBM Defendants are not only in possession of massive amounts of information about opioid prescribing, but they also have sufficient market power to encourage and/or drive prescribing, dispensing, and sales of prescription drugs.

124.    The PBMs Defendants incentivize their clients to adopt their standard drug lists by implementing financial consequences for deviating from them.  By incentivizing use of their standard drug lists and utilization management tools[10], the PBM Defendants dictate the consumer cost and restrictions (or lack of restrictions) placed on prescription opioids. By designing drug lists with opioids placed on lower tiers and fewer restrictions, the PBM Defendants ensure that they can deliver opioid drug sales to their drug manufacturer partners.  By working to increase opioid utilization, the PBM Defendants directly contributed to the dispensing of more opioid pills to the people of Hawai'i than were needed for legitimate medical purposes.

125.    Although the PBM Defendants claim that their drug lists are designed to achieve favorable health outcomes for patients, the PBM Defendants' plans and drug lists are, in fact, designed to maximize profits for the PBM Defendants by encouraging increased drug utilization.

    **1.  The PBM Defendants and the Opioid Manufacturers Colluded to Ensure Virtually Unfettered Access to Opioids.**

126.    The PBM Defendants' influence over drug lists has been a key contributor to their ongoing relationship with opioid manufacturers, because the manufacturers paid the PBM Defendants for favorable drug placement within their standard drug list offerings.

127.    Since at least 2000, opioid manufacturers have paid the PBM Defendants to make their opioid products, including OxyContin, more readily accessible to health plan members.

---

[10] Common utilization management tools include: (i) step therapy, where a beneficiary is required to try a different drug before trying the restricted drug; (ii) quantity limits, which limit the dosage or days' supply that a patient may receive; and (iii) prior authorization, which requires a physician to confirm that a given prescription is therapeutically appropriate before the drug is dispensed.

128.    The agreements between opioid manufacturers and the PBM Defendants prohibit the PBM Defendants from disclosing their terms, including to the PBM Defendants' health plan clients.

129.    This covert collusion between the PBM Defendants and the opioid manufacturers facilitated the PBM Defendants' promotion of opioid manufacturers' products for their mutual financial gain.

130.    Even years after Express Scripts knew OxyContin was a heavily abused drug, it pushed Purdue for larger payments in exchange for favored treatment of OxyContin. For example, in 2014, Express Scripts reached out to Purdue requesting a higher payment to maintain OxyContin's favored status. Purdue executives agreed, given the importance of the Express Scripts relationship to OxyContin sales: "[Express Scripts/Medco] commercial is 20-25% of our total OxyContin gross business, and the spillover effect of a negative move by [Express Scripts] on OxyContin in 2015 cannot be underestimated . . . Given the importance and impact of this customer on OxyContin sales . . . I approve [the decision to increase payments regarding OxyContin]." Express Scripts celebrated this increase as a win: "we got $20M in incremental from Purdue on OxyContin . . . Not too bad considering likely not doing anything."

131.    The PBM Defendants and opioid manufacturers also regularly discussed which utilization management measures, if any, would apply to particular opioid drugs.

132.    Throughout their confidential negotiations with opioid manufacturers, in exchange for payment, the PBM Defendants agreed that they would not "disadvantage" opioid drugs, nor would they place utilization management restrictions on their use within their standard offerings. Thus, the parties agreed that prescription opioids would have no more utilization management restrictions than drugs that did not have the same propensity for abuse. Effectively, this meant that

31

the PBM Defendants bartered away the application of utilization management measures, which opened the floodgates to these dangerous drugs.

133.    For example, a 2002 contract included language stating Purdue would not pay Express Scripts if Purdue's opioids were restricted. Likewise in 2009, Purdue agreed to pay Express Scripts only if its opioids were "unrestricted on the preferred brand tier." Again, in 2014, Purdue stated that it would pay Express Scripts only if OxyContin was on the "lowest preferred brand tier, without restrictions, including no prior authorization or step therapy." Even as late as 2016, Express Scripts acknowledged that any restrictions on OxyContin (such as restricting opioid use to acute pain, blocking opioids unless the use was for cancer or other approved uses, or requiring prior authorization) would violate its payment agreements with Purdue, resulting in significant financial losses.

134.    Optum's template payment agreements had similar language tying payment to common treatment of all other opioids in the drug list's therapeutic category. Specifically, its contractual language stated that amounts would be payable only if the opioid manufacturer's product is not "subject to Disadvantaging including, but not limited to: prior authorization, NDC blocks, counter-detailing, co-pay differentials, dispensing restrictions, therapeutic conversion programs, therapeutic substitution, other access or reimbursement restrictions, or endorsed targeted messages (electronic edits)."

135.    The PBM Defendants and each opioid manufacturer negotiated lockstep parity terms that normalized the use of utilization management measures across the entire class of opioids, thereby virtually guaranteeing those measures would not be used on opioids and the overall market for prescription opioids would not diminish. These agreements conditioned payment on each opioid manufacturer not being disadvantaged by utilization management

measures unless the entire market basket of all competing drugs was treated the same. The parity terms, therefore, ensured that no single opioid manufacturer would be disadvantaged against the other and then, each could be free to compete for market share of their drug within the fraudulently increased system. The opioid manufacturers knew that utilization management presented a slippery slope—if more utilization management measures were employed, it would ultimately lead to the adoption of restrictions across the entire class of drugs.

136.     Despite its knowledge of the nationwide opioid health crisis, and despite its knowledge that favored drug list placement and the lack of utilization management restrictions had increased opioid sales, Express Scripts continued OxyContin's placement on the most favored brand drug list tier, with no utilization management restrictions, on nearly all standard drug list offerings through at least 2017.

137.     Likewise, for most of the relevant time period, OptumRx also granted OxyContin unrestricted, favored drug list status for most of its standard drug lists. OptumRx also refused to require prior authorization or put effective quantity limits on opioids.

138.     Thus, from the late 1990s through 2018, the PBM Defendants granted both brand and generic opioids, including OxyContin, favored positions on their standard drug list offerings, which was critical to the opioid manufacturers' success in increasing utilization and expanding the opioid market both nationally and in Hawaiʻi.

139.     Rather than provide transparency into their dealings with the opioid manufacturers, Express Scripts and Optum represented to their clients, patients, and the public that they designed drug list offerings to promote the safe use and appropriate prescribing of opioids. These representations were false. In truth, Express Scripts and Optum instead constructed standard drug

lists that granted unfettered access to specific opioids in exchange for significant payments to the PBM Defendants.

> **2.    For Two Decades After They Knew the Opioid Epidemic Was Occurring, the PBM Defendants Conspired with the Opioid Manufacturers in the Deceptive Marketing of Opioids.**

140.    Beginning in the late 1990s, opioid manufacturers—including Purdue—engaged in a multifaceted campaign to expand the opioid market by creating and disseminating misinformation about the safety and efficacy of opioids used in chronic pain treatment and the risks of opioid addiction.

141.    The PBM Defendants knew that there had never been reliable evidence demonstrating opioids were safe or effective at treating chronic long-term pain. The PBM Defendants further knew that opioids, particularly when used long-term to treat chronic pain, carry serious risks of addiction. And yet, starting shortly after the release of OxyContin and continuing for years after the opioid epidemic spread throughout the country, the PBM Defendants worked with the opioid manufacturers in numerous capacities to: (1) disseminate to high prescribers and patients, including the elderly and other vulnerable populations, across the United States, including Hawaiʻi, false messages[11] about chronic pain and addiction; and (2) provide research, data, and consulting services to assist in expanding the opioid market in the United States, including Hawaiʻi.

---

[11] These false messages included: (1) opioid use is associated with some moderate side effects, but the risk of drug dependence is low; (2) concerns about abuse, addiction, and diversion should not prevent the proper management of chronic and low back pain; (3) opioids are the most effective way to treat pain; (4) opioid addiction does not occur in the chronic pain patient; and (5) certain signs of addiction (*i.e.,* "drug seeking behavior") are actually indicative of "pseudoaddiction," an iatrogenic syndrome that purportedly mimics the behavioral symptoms of addiction in patients receiving inadequate doses of opioids for pain.  The unproven (and subsequently debunked) concept of pseudoaddiction was first introduced by a Purdue-funded physician in 1989.

142.    The PBM Defendants' participation in the fraudulent marketing of opioids continued even after Purdue pled guilty to criminal misbranding of OxyContin in 2007 and long after their own data told them that the huge increases in opioid prescribing were creating a crisis of addiction, overdose, and death.

143.    Regardless of what the PBM Defendants knew or did not know at the outset of their marketing activities, they continued to engage in fraudulent marketing of opioids long past the point where they had actual knowledge of the falsity of the representations they were disseminating.

### a.    The PBM Defendants Disseminated the Opioid Manufacturers' Deceptive Propaganda.

144.    Starting in the late 1990s—after granting Purdue's opioids favored, unrestricted drug list placement in their standard offerings—the PBM Defendants partnered with Purdue and other opioid manufacturers to spread false information about opioids to increase opioid sales and expand the market.

145.    For example, in 2000 and 2001, Express Scripts worked on numerous programs to disseminate "educational" materials to tens of thousands of patients and high prescribers of OxyContin, advocating for opioids in chronic pain treatment and downplaying the risks of addiction.

146.    A number of joint programs between Express Scripts and Purdue were prompted by Express Scripts' desire to work with Purdue to address the negative attention that OxyContin was receiving related to abuse and diversion in the early 2000s. For example, a March 14, 2001 letter from Express Scripts to Purdue explained, "[c]learly, with the market turbulence surrounding OxyContin, you and your organization have significant demands on your time . . . there are several

strategic initiatives where Express Scripts can support Purdue Pharma in your efforts to educate the market on the prescribing, administration and consumption of OxyContin."

147.    These "strategic initiatives" proposed by Express Scripts included sending 15,000 "targeted" mailings to physicians, which included: (1) a letter written by Express Scripts' Medical Director summarizing key principles promoted by the American Pain Society, a front group for Purdue; and (2) Purdue-created brochures, "The Patient Bill of Rights for Pain Management" and "Dispelling the Myths about Opioids," both of which contained misinformation about OxyContin's risk of addiction.

148.    Three years later, Express Scripts and Purdue developed a series of pro-opioid pain management presentations for Express Scripts' clients that were conducted by Purdue-employed doctors and medical professionals.

149.    During these same years, Purdue also conspired with Optum to spread misinformation about the use of opioids to treat chronic pain and the risks of opioid addiction. In February 2003, UHC and OptumInsight met with Purdue to give a presentation on "Managing Chronic Pain Associated with Lower Back Pain." The goal of this presentation was to develop a comprehensive plan between Purdue, UHC, and OptumInsight to "re-educate" physicians to prescribe opioids for the treatment of chronic pain and low back pain.

150.    As a result of this meeting, in 2004, OptumInsight and Purdue executed a Master Services Agreement to roll out a program that involved Purdue, UHC, and OptumInsight working together to target physicians—identified by UHC and OptumInsight's database[12]—with false and misleading "educational" materials on the effectiveness of opioids in chronic pain treatment.

---

[12] To assist in the opioid manufacturers' marketing efforts, the PBM Defendants have for years provided multiple opioid manufacturers with lists of all their plan clients, as well as the names of their plans' participating physicians. The manufacturers used this information to target the highest

151.    OptumRx affiliates also marketed their data analytics capabilities to Purdue for research projects related to opioids, including studies addressing OxyContin overdoses and patient disenrollment from Medicare Advantage plans that discontinued coverage of OxyContin ER.

152.    In 2013, OptumRx also participated in a Purdue advisory board for the "abuse deterrent" version of OxyContin, which was focused on payers in managed care. Later, in 2016, OptumRx conducted studies for Purdue to assess the economic impact of reformulated OxyContin.

153.    As late as 2017, Express Scripts gave educational presentations on pain management that minimized the risk of opioid addiction. In a presentation regarding "The Management of Persistent Pain in Older Persons," Express Scripts Vice President Andrew Behm asserted that psychological dependence to narcotic analgesics was "rare" and that "[a]ddiction associated with the appropriate use of opioid analgesics is uncommon."

> **b.**    **The PBM Defendants' Affiliated Entities Provided Research, Data, and Consulting to the Opioid Manufacturers to Expand the Opioid Market.**

154.    In addition to assisting the opioid manufacturers in spreading false information about opioids, the PBM Defendants and their affiliated companies provided the manufacturers with data, research, and consulting services needed to expand the opioid market.  The result of these joint efforts—in the words of Express Scripts—was an "opiate explosion: vast increase in prescribing [and] more potent formulations [of opioids]."

155.    In the late 1990s and early 2000s, Express Scripts' affiliate research entity, Practice Patterns Sciences, Inc. ("PPS"), and Medco's Institute for Effectiveness Research provided research and studies for Purdue to aid its efforts to expand the opioid market. For example, in

---

opioid prescribers with pull-through marketing, a strategy that involves attracting or drawing customers towards a product, service, or brand by creating interest and demand.

2001, Express Scripts/PPS developed a study for Purdue on "The Value of OxyContin Therapy in Patients with Moderate to Severe Pain due to Osteoarthritis."

156.    Similarly, from the early 2000s through 2015, OptumInsight helped Purdue generate clinical studies, educational materials, and marketing programs to downplay the addictive properties of OxyContin and expand its use throughout the country, including Hawaiʻi.[13] Specifically, Purdue paid OptumInsight to reverse engineer studies to achieve desired outcomes; create algorithms to identify potential pain patients, including the elderly and other vulnerable populations, for OxyContin prescriptions; and create large-scale marketing plans to convince payors that long-term opioid usage was not only useful for many types of pain, but did not lead to serious addiction.

157.    For example, in 2000 and 2001, OptumInsight (then known as Ingenix) worked with Purdue to develop algorithms ("chronic pain patient identification algorithm") and studies ("Profiling the OxyContin Patient") to identify chronic pain patients. Purdue's goal was to use OptumInsight's "data/evidence" to demonstrate, from a payer and patient perspective, the clinical/financial benefit of OxyContin given the overall costs associated with the undermanagement of pain. Purdue paid for this study, in part, to counter the focus in the market on "cases of diversion" and the "premium pricing" of OxyContin.[14]

158.    In October of 2002, OptumInsight proposed a "Chronic Pain Management" study and education initiative to be presented in a series of teleconferences to providers in the UHG/UHC

---

[13] From 2003 to at least 2012, OptumInsight conducted similar studies for other opioid manufacturers. For example, in 2012, OptumInsight performed an analysis attempting to show that Suboxone film was superior to a tablet formulation in preventing diversion, abuse, or misuse.

[14] Alongside the studies OptumInsight was producing for Purdue, OptumHealth, a subsidiary of UHC, began an "educational endeavor" with Purdue in the early 2000s to educate nurses and case managers throughout the country on the undertreatment of pain.

network. Launched later that same year, the initiative was to "optimize patient care in the treatment of chronic pain" by advocating that "[m]ost specialists in pain medicine and addiction agree that patients with prolonged opioid therapy . . . do not usually develop addictive behavior," and by convincing providers that "[o]pioids are effective, have a low addiction potential, and may have fewer long-term side effects than other [pain treatments]."

159.    In 2004, David Rosen, a Purdue marketing employee, connected his father, Dr. Michael Rosen, a National Medical Director at OptumHealth from 1996-2021, with Purdue Account Executives.  Dr. Rosen, who also led UHC's Pharmacy & Therapeutics Committee (a group which helped develop its national drug lists), began purportedly "educating" UHC's medical staff on how to effectively manage pain.

160.    In January 2005, Dr. Rosen coordinated with Purdue to present two major Continuing Education Programs to UHC case managers. Part of the program targeted nurse practitioners and included a presentation called, "Communication to Enhance Collaboration and Outcomes."  The presentation emphasized the "Possible Adverse Effects of Undertreated Pain" and advocated for increased opioid use, stating, "[i]f we continue to provide pain care as it has always been provided, patients will continue to suffer needlessly." The same presentation was given to case managers, then expanded to UHC affiliated groups throughout the country, including risk managers and telephone triage nurses.

161.    In 2009, Dr. Rosen worked with Purdue to roll out a six-month "chronic pain management program" that would directly link to Purdue's "Partners Against Pain" website. The program, which was to focus on Optum case managers nationwide, was presented by Optum Medical Directors and some Purdue employees.

39

162.    From 2011 through at least 2015, Purdue and OptumInsight also worked together to build a comprehensive, multi-step "aspirational statement" and "evidence-generated" strategies for OxyContin and other opioids. The goal of this coordinated effort was to identify the best way to position these drugs with the public, patients, providers, and payors to increase utilization and maximize sales.

163.    In sum, the PBM Defendants' affiliated entities provided research, data, and consulting to opioid manufacturers that inappropriately expanded the opioid market across the United States, including Hawai'i.

### 3.    The PBM Defendants Failed to Use Real-Time Data and Other Tools to Address the Opioid Epidemic They Helped Create.

164.    The PBM Defendants had a front row seat to the spread of the opioid epidemic. They watched as the number of opioids prescribed and dispensed exploded. They were made aware of the opioid epidemic in real-time through: (1) their vast amounts of data; (2) the knowledge gained through their clients, manufacturers, and other entities in the health care arena; and (3) clinical evaluations for things such as drug list placement.

165.    The PBM Defendants also knew they had the ability to address the overutilization of prescription opioids. Yet, time and time again, the PBM Defendants chose not to take action.

### a.    The PBMs Had Access to Real-Time Data Regarding Drug Utilization and Failed to Use It to Limit the Oversupply of Opioids.

166.    Through servicing their clients' health plans, the PBM Defendants had and have access to an extraordinary amount of data[15] regarding individual prescribers and pharmacies.

---

[15] The data includes information such as the volume, nature, dosage, and conditions for which health care providers are prescribing opioids, both on an individual and aggregate basis; the volume of opioids obtained by individual patients and by geography; the pharmacies at which opioids were dispensed, and the volume of opioids dispensed by geographic area. Mail order pharmacies owned and operated by Express Scripts and Optum generate additional data.

Moreover, the data is uniquely granular and comprehensive, in that both Express Scripts and Optum can aggregate it across manufacturers, patients, pharmacies, and payors.

167.    For the past two decades, Express Scripts has processed millions of prescription claims per day for health plan members that involve hundreds of data points. Since the 1990s, Express Scripts has possessed as much—if not more—detailed claims data on opioid utilization and prescribing than any other entity in the pharmaceutical industry.

168.    Since 1997, Express Scripts has compiled in-depth drug utilization analyses of claims data in its Drug Trend Reports. Accordingly, these Drug Trend Reports reflect Express Scripts' knowledge of increasing OxyContin and opioid utilization, as well as its understanding of the related dangers.

169.    Express Scripts' ability to monitor and analyze opioid prescription data is best exemplified by its 2014 report, "A Nation in Pain," which examined 36 million opioid-related pharmacy claims from 2009-13.  In creating the report, Express Scripts demonstrated its ability to identify opioid use trends by geography, age, and gender, as well as by the prevalence of doctor shopping, pharmacy shopping, and "drug cocktail" use.

170.    Similarly, Optum (and/or its predecessors) had access to data for 66+ million health plan members for the entirety of the relevant time period.  Optum has been able to track how many opioids those millions of members received, including the quantity of pills, dosing strengths, combination of drugs being dispensed, and the distance members traveled to acquire prescription opioids. Additionally, Optum has access to clinical information generated on behalf of millions of patients, including over 4.5 billion text notes relating to members' clinical records.

171.    In a presentation touting the effectiveness of Optum's opioid management program, Senior Vice President of Clinical Engagement David Bashera acknowledged Optum's ability[16] to stop inappropriate opioid utilization at the pharmacy counter:

> "I have billions of claims, literally billions of claims. Every claim that we go through goes through an algorithm. This is all happening in realtime at the pharmacy. When you go to the pharmacy, in microseconds, I know if my patients are on a concurrent benzo. I know what the dose is. I know what the day's supply is. I know what other drugs they're taking, and I can have realtime [point of sale] edits going through making sure everything is happening appropriately."

172.    In other words, the PBM Defendants were fully aware that the volume of opioids being prescribed in the United States, including in Hawai'i, far exceeded an amount that could possibly be medically necessary or appropriate.

173.    To make matters worse, rather than use detailed claims data to stop the unfolding public health crisis, the PBM Defendants sold the data, along with their clients' drug list and health plan information, to Purdue and other opioid manufacturers.  Accordingly, since 1997, opioid manufacturers have used this data to determine which pharmacies and health care providers were dispensing and prescribing their opioid products (and which were not). These data purchases ultimately allowed the opioid manufacturers' sales representatives to target high prescribers and pharmacies to aggressively push even more prescription opioids into the market.

---

[16] Before 2007, Prescription Solutions (OptumRx's predecessor) also had the ability to review every claim submitted by its members and "look for problem patterns and intervene with prescribers closer to the point of a member's care," including being able to identify both doctor shopping and pharmacy shopping by patients, as well as other red flags, such as early refills or suspicious drug combinations.

      **b.**    **The PBM Defendants Were Otherwise Aware That Their Business Practices Were Exacerbating the Opioid Epidemic.**

174.    According to the Centers for Disease Control and Prevention (CDC), the rise in opioid overdose deaths involves three distinct waves: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[17]

175.    Research suggests the United States has entered the fourth wave of the opioid epidemic. A 2023 study from researchers at the University of California, Los Angeles, noted that "scholars have argued that the 'fourth wave' of the US overdose crisis has begun, in recognition of rapidly rising polysubstance overdose deaths involving illicitly manufactured fentanyl, with stimulants playing a key role."[18] These waves represent a culmination of a long road of crisis level addiction beginning with *prescription opioid abuse.*[19]

---

[17]  https://www.cdc.gov/museum/pdf/cdcm-pha-stem-uncovering-the-opioid-epidemic-lesson.pdf (last accessed 8/1/25).

[18] Friedman, J, Shover, CL, Charting the fourth wave: Geographic, temporal, race/ethnicity and demographic trends in polysubstance fentanyl overdose deaths in the United States, 2010–2021, 118 ADDICTION 2478 (Dec. 2023), https://onlinelibrary.wiley.com/doi/10.1111/add.16318 (last accessed 8/1/25).

[19] Prescription opioid abuse has been shown to be a gateway to heroin and fentanyl abuse. As noted, according to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade had previously abused prescription opioids.

176.    Express Scripts' own marketing material explicitly recognizes this evolution in the national opioid crisis:



177.    Likewise, Optum's promotional material also acknowledges these progressive stages of the opioid epidemic:



178.    Long before the second wave of the crisis began in 2010, both Express Scripts and Optum knew that opioid abuse and misuse posed serious problems.

179.    For example, in early 2001, an executive of Optum's parent company, UHG, wrote to Purdue to discuss the "whole OxyContin overuse issue . . . which has been brought about by the 'heightened marketing skills of Purdue.'" The email continued, "I believe Purdue has acted irresponsibly in over-promoting the use of oxycodone . . . [and t]his activity has resulted in the overuse of morphine, an increase in the abuse of this narcotic, unnecessary and significant increases in pharmacy trend, and most importantly, an increase in patient morbidity and mortality."

180.    Similarly, starting in at least the early 2000s, certain clients also began to express concern to the PBM Defendants about abuse and diversion issues related to OxyContin. Upon hearing from their clients, Express Scripts and Medco would often reach out to Purdue directly seeking help to quash these concerns. Purdue often worked with the PBM Defendants by providing research and "educational" materials downplaying the risks of opioid use.

181.    The PBM Defendants also knew that opioids were being improperly marketed because, among other things, Purdue pled guilty to criminal misbranding of OxyContin in 2007. The plea agreement identified specific representations that Purdue acknowledged were false. The PBM Defendants knew that these same misrepresentations were still being used by Purdue and others to market prescription opioids.

182.    In 2009, Express Scripts received an email from a client stating, "Houston, we have a problem, and its name is Oxycontin." That same year, another large client reached out to Express Scripts regarding its desire to put into place an "aggressive [prior authorization] policy" on opioids to combat "rampant abuse and inappropriate" opioid use.

183.    In summary, for more than 20 years, the PBM Defendants knew that opioids were addictive and carried a significant risk of serious injury or death.

c.    The PBM Defendants Chose Not to Restrict Opioid
Access and Utilization.

184.    For decades, the PBM Defendants understood that they possessed the ability to address the overutilization of prescription opioids.

185.    Express Scripts' own studies dating back to at least 2002 demonstrate the effectiveness of utilization management tools, such as prior authorization, in decreasing inappropriate opioid utilization.  In fact, in 2002, Express Scripts researchers conducted a study to "examine the clinical and economic outcomes associated with a prior authorization (PA) requirement for OxyContin." The study concluded that prior authorizations significantly decreased inappropriate OxyContin utilization.

186.    Express Scripts' internal documents reveal that it had received "requests in 2007 for [point of sale] programs for managing inappropriate narcotic utilization . . . [because] a more robust standard program covering all narcotics was desired." But Express Scripts declined to implement a prior authorization on opioids.

187.    Moreover, Express Scripts' Vice President of Clinical Evaluation & Policy, Andrew Behm, acknowledged in 2010 that "overutilization of opiates continues to be a significant problem" and recognized that "non-opiate pharmacotherapies" should be promoted. Yet Express Scripts again failed to offer a non-opiate step therapy protocol.

188.    Despite knowing for decades that use of prior authorizations was a best practice for preventing opioid overutilization and abuse, Express Scripts failed to require a prior authorization on prescription opioids until 2017—after the U.S. Senate had twice contacted Express Scripts regarding its role in the opioid epidemic.

189.    For years, Optum also avoided implementing prior authorizations or other utilization management protocols for fear of lost profits.  The best example of this occurred in

2013, when OptumRx created a "pay to avoid PA" program on long-acting opioids. This was not a clinical prior authorization; instead, it was a threat to extract higher payments from the opioid manufacturers. The strategy was simple:  make the opioid manufacturers "Pay to avoid a PA."

190.    OptumRx did not place any clinically appropriate prior authorizations on its best-selling, long-acting opioids until January 1, 2018, because doing so would have: (1) resulted in lost profits; and (2) required OptumRx to renegotiate all of its existing payment agreements with opioid manufacturers.  Similarly, OptumRx did not require prior authorizations on short-acting opioids until the launch of its Opioid Risk Management Program in late 2017, despite Optum being aware that opioid abuse was being driven primarily by short-acting generic opioids.[20]

191.    The PBM Defendants also chose not to use their concurrent drug utilization review programs to help prevent the spread of the opioid epidemic.  Concurrent drug utilization review involves the real-time evaluation of drug therapy and intervention, including screening at the point of sale for potential drug therapy problems due to therapeutic duplication, age/gender-related contraindications, over-utilization and under-utilization, drug-drug interactions, incorrect drug dosage or duration of drug therapy, drug-allergy contraindications, and clinical abuse/misuse.

192.    Internal documents obtained from the PBM Defendants reveal that manufacturer payments directly impacted how the PBM Defendants managed access to opioids, including their use (or non-use) of concurrent drug utilization review to ensure only safe and appropriate opioid prescriptions would be filled.

---

[20] By no later than 2011, the PBM Defendants had also been put on notice by the Centers for Medicare and Medicaid Services ("CMS") that all actors involved in delivery of healthcare in the United States needed to take steps to address the overutilization of prescription opioids.  Even with CMS calling attention to their responsibility to prevent opioid misuse, however, the PBM Defendants chose not to take any noteworthy action for several more years.

193.    The PBM Defendants refused to use concurrent drug utilization review to control opioid misuse because doing so would have adversely impacted their revenue, including receipt of manufacturer payments, income generated from opioid dispensing, and other administrative fees. For years, the PBM Defendants have refused to deploy concurrent drug utilization review initiatives to ensure that only appropriate opioid prescriptions were being dispensed from their mail order pharmacies and in retail pharmacies across the country, including Hawai'i.

194.    For example, as early as 2007, Prescription Solutions (OptumRx's predecessor) identified opioid patients engaging in doctor and pharmacy shopping as part of its concurrent drug utilization review program. Thereafter, however, only minimal action was taken.  The prescribers involved merely received a fax or mailing with each patient's drug utilization information, along with materials on "appropriate opioid use," based on guidelines issued by the American Pain Society and the Federation of State Medical Boards—pro-opioid groups who worked closely with Purdue and other opioid manufacturers. These faxes and mailings, unsurprisingly, did little to change prescribing patterns.

**B.    The PBM Defendants' Mail-Order Pharmacies Fueled the Opioid Epidemic by Dispensing Opioids in Violation of HUCSA and the CSA.**

195.    The PBM Defendants operate two of the largest mail-order pharmacies in the country.  Express Scripts and Optum are required to comply with the Hawai'i Uniform Controlled Substances Act ("HUCSA"), other Hawai'i laws pertaining to controlled substances, and the federal Controlled Substances Act ("CSA") and its implementing regulations.

196.    As participants in the supply chain of controlled substance distribution including, but not limited to, opioids and opioid cocktail drug distribution, Express Scripts and Optum are responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

48

197.    The PBM Defendants are required under HUCSA to register to manufacture, distribute, prescribe or dispense any controlled substances, including prescription opioids, in the State of Hawaiʻi (including "shipping, mailing, or otherwise delivering the controlled substance from a location" out of Hawaiʻi).[21]  As registrants, the PBM Defendants assumed the duty of conducting their business consistent with the public interest by, among other things, "[m]aintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels."[22]

198.    A registrant who "has reason to believe that a controlled substance in the holder's inventory has been … otherwise obtained by fraud or diversion" has a duty to "immediately report the matter verbally to the administrator" and "submit a written report to the administrator as soon as practical following the verbal report."[23]

199.    Under Hawaiʻi law, "the pharmacist who fills a prescription" has a "corresponding responsibility" for the proper prescribing and dispensing of controlled substances.[24] "An order purporting to be a prescription issued not in the usual course of professional treatment or for legitimate and authorized research shall not be deemed a prescription" and "the person who knowingly fills such a purported prescription, as well as the person who issues the prescription, shall be subject to the penalties provided for violations of this chapter."[25]

---

[21] HRS § 329-32, -33; Section 23-200-3, Hawaiʻi Administrative Rules.

[22] HRS § 329-33(a)(1); *accord* 21 U.S.C. § 823(a)(1), (b)(1).

[23] HRS § 329-37.5.

[24] HRS § 329-38(f).

[25] *Id.*

49

200.    Hawaiʻi also requires that "[e]very registered pharmacist in charge of a pharmacy shall comply with all laws and rules."[26]

201.    The State's claims are based on Express Scripts' and Optum's duties, their failure to establish effective dispensing policies and procedures, their failure to use the data they had regarding the dispensing of prescriptions, and their failure to properly train their employees regarding the duties imposed by Hawaiʻi law.  Express Scripts and Optum failed to meet their obligations under Hawaiʻi law.

202.    The bases for the State's claims under Hawaiʻi law are informed, in part, by industry guidelines and the kinds of activities and security measures deemed reasonable or necessary under other statutory and regulatory schemes intended to prevent abuse, overuse, or diversion of opioids and other controlled substances, such as the CSA and DEA regulations and procedures.[27]

203.    The CSA and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States, including Hawaiʻi. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[28]

---

[26] HRS § 461-11.

[27] Hawaiʻi controlled substance laws are routinely amended as to comport with provisions of the CSA.  *See, e.g.*, HRS § 329-11(d) ("If a substance is added, deleted, or rescheduled as a controlled substance under federal law and notice of the designation is given to the department of law enforcement, the department of law enforcement shall recommend that a corresponding change in Hawaii law be made.").

[28] *See* 21 U.S.C. § 841(a).

204.    The CSA categorizes controlled substances in five "Schedules."

205.    Schedule II (a/k/a CII) contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[29]

206.    Schedule III contains drugs that have a lower abuse potential than Schedule II drugs but may, if abused, lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[30]

207.    Schedule IV contains drugs that have a lower abuse potential than Schedule III drugs but still may lead to a physical or psychological dependence when abused.[31]

208.    Schedule V contains drugs that have a lower abuse potential than Schedule IV drugs but may lead to a physical or psychological dependence when abused.[32]

209.    The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[33]

210.    Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[34] A registrant is permitted to dispense

---

[29] 21 U.S.C. § 812(b)(2).

[30] 21 U.S.C. § 812(b)(3).

[31] 21 U.S.C. § 812(b)(4).

[32] 21 U.S.C. § 812(b)(5).

[33] 21 U.S.C. § 841(a)(1).

[34] 21 U.S.C. § 822(a).

or distribute controlled substances only "to the extent authorized by their registration and in conformity with the [CSA]."[35]

211.    An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[36]

212.    At all times relevant to this Complaint, the PBM Defendants have registered their mail order pharmacies with the DEA as to Schedule II–V controlled substances. Those DEA registrations authorize the PBM Defendants'-owned pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[37]

213.    Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Specialty Distribution Services, Inc.; and OptumRx are the Defendant entities registered with the DEA.

214.    Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered mail order pharmacy like those owned by the PBM Defendants, are not  required to register with the DEA "if such agent or employee is acting in the usual course of his business or employment."[38]

215.    Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and, more specifically, Part 1306 of the CSA's implementing regulations.[39]

---

[35] 21 U.S.C. § 822(b).

[36] 21 U.S.C. § 829.

[37] 21 U.S.C. § 802(10), *accord* 21 U.S.C. § 823(f).

[38] 21 U.S.C. § 822(c)(1).

[39] *See generally* 21 C.F.R. § 1306.

216.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency.[40] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a practitioner's written or oral prescription.[41]

217.    A prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[42]

218.    A prescription, whether written or oral, is legally valid under the CSA *only* if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[43] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."[44]

219.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[45] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

---

[40] 21 U.S.C. § 829(a).

[41] 21 U.S.C. § 829(b).

[42] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[43] 21 C.F.R. § 1306.04(a).

[44] *Id*.

[45] *Id*.

220.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy…."[46]

221.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice—*i.e.,* "the usual course of his [or her] professional practice" of pharmacy.[47]

222.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[48]

223.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions.[49]

224.    In determining whether a prescription was written for a legitimate medical purpose, the pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing. A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[46] 21 C.F.R. § 1306.06.

[47] *Id*.

[48] *See* 21 C.F.R. §§ 1306.04, 1306.06.

[49] 21 U.S.C. §§ 842, 843.

225.    A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule, and both the pharmacy and pharmacists may be the subject of further discipline.[50]

226.    The DEA has repeatedly emphasized that DEA registrants—like the PBM Defendants—are required to implement systems that will detect and prevent abuse and diversion, including by monitoring for red flags of abuse and diversion. The DEA has also repeatedly affirmed registrants' obligations to maintain effective anti-diversion controls in numerous regulatory actions. According to the DEA, pharmacists are the "[l]ast line of defense."[51]

227.    As indicated, the framework of state and federal statutes and regulations, along with industry guidelines, make clear that pharmacies are expected to use specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled controlled substances and the risks and dangers of their abuse and diversion when such medications are dispensed outside the usual course of professional practice.

228.    Despite their legal obligations as registrants under Hawaiʻi law, Express Scripts and Optum knowingly allowed widespread diversion to occur.

229.    The PBM Defendants had the ability to analyze vast amounts of data relating to drug utilization and prescribing patterns across numerous retail stores and geographic locations that should have alerted them to red flags of diversion related to prescriptions being dispensed in Hawaiʻi. The PBM Defendants track every prescription claim they process for each health plan

---

[50] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020) (citing *Jones Total Healthcare, L.L.C. v. DEA*, 881 F.3d 823 (11th Cir. 2018)).

[51] *See* Thomas W. Prevoznik, *Birmingham Pharmacy Diversion Awareness Conference, DEA Perspective: Pharmaceutical Use & Abuse*, at 132 (Mar. 28-29, 2015), https://web.archive.org/web/20160418074249/https://www.deadiversion.usdoj.gov/mtgs/pharm_ awareness/conf_2015/march_2015/prevoznik.pdf (last accessed 8/1/25).

they service. The PBM Defendants had the ability to aggregate this data across various entities in the pharmaceutical supply chain, including drug manufacturers, pharmacies, insurers, and patients. Their own data, therefore, enabled the PBM Defendants to observe patterns or instances of dispensing that were potentially suspicious.

230. Rather than use their data to identify red flags of diversion, the PBM Defendants sold their data to third-party vendors which, in turn, resold the data to drug manufacturers for marketing purposes.

231. Upon information and belief, in Hawaiʻi, Express Scripts and Optum failed to use their data to ensure that the prescriptions they were filling through their mail order pharmacies were issued to legitimate patients for legitimate medical purposes by practitioners acting in the usual course of professional practice, as is evident by the copious amounts of opioids dispensed by the PBM Defendants' mail order pharmacies throughout the United States.[52]

232. Between 2006 and 2019, Express Scripts and Optum mail order pharmacies purchased more than 35 billion MMEs of opioids, spread over more than 1.5 billion dosage units, according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").

233. The PBM Defendants' mail order pharmacies operated to push virtually all prescriptions out the door, with little or no attempt at identifying or resolving red flags, as

---

[52] The PBM Defendants' mail order pharmacy entities were subject to DEA regulatory actions for their failures to implement appropriate controls on dispensing. For instance, on May 15, 2012, Express Scripts Pharmacy Services, Inc. agreed to pay the United States $2.75 million to resolve alleged violations of the CSA. From 2002 through 2006, drug diversion occurred at several Express Scripts mail order facilities, including facilities in Bensalem, Pennsylvania and Harrisburg, Pennsylvania. Express Scripts experienced theft by employees of controlled substances, had inventory discrepancies, and failed to report in-transit losses to the DEA. According to the DOJ press release, from 2004 through 2009, Express Scripts employees also utilized invalid DEA numbers in Express Scripts' computerized prescription processing system at all of its mail order facilities.

evidenced by the PBM Defendants' procedures, which pressured pharmacists to fill large volumes of prescriptions in short order, making adequate due diligence nearly impossible.

234.    Upon information and belief, among other things, Express Scripts and Optum failed to analyze: (a) the number of opioid prescriptions filled in a geographical area relative to the population of the community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

235.    Upon information and belief, Express Scripts and Optum also failed to: (1) conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled; (2) create dispensing policies in accordance with such audits; and (3) take any meaningful action as a result.

236.    The PBM Defendants violated HUCSA and other Hawai‘i law each time their mail order pharmacies filled a controlled substance prescription without identifying and resolving red flags because, *inter alia*:

- Those prescriptions were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not filled pursuant to a valid prescription under HRS § 329-38(f); and

- Those prescriptions were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of HRS § 329-38(f).

237.    The PBM Defendants failed to maintain effective controls against diversion, including by failing to conduct due diligence to ensure opioids were not diverted, resulting in the gross-over-dispensing of opioids. Consequently, the PBM Defendants directly contributed to the ongoing opioid epidemic, including the harm suffered in Hawai‘i.

### C.    Express Scripts and Optum Contributed to the Public Nuisance in Hawaiʻi.

238.    By conspiring with and aiding and abetting the opioid manufacturers, facilitating the overprescribing and overuse of opioids, failing to address evidence of the misuse, abuse, and addiction to opioids, and failing to prevent diversion in their mail order dispensing and in their pharmacy networks, the PBM Defendants contributed to the oversupply of opioids in Hawaiʻi and the resulting public nuisance.

239.    According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022. Since 1999, the amount of prescription opioids dispensed in the United States and the number of overdose deaths involving opioids have quadrupled.  More than 1,000,0000 people have died from a drug overdose during that same period.[53] In 2023, almost 70% of drug overdose deaths involved an opioid.[54]

240.    In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost $1.04 trillion in 2018, $985 billion in 2019, and nearly $1.5 trillion in 2020.

241.    As in many other states, opioid use and abuse remains at crisis levels in Hawaiʻi. The total number of opioid-related fatal overdoses in Hawaiʻi steadily increased between 2019 and 2023, even though its overall opioid dispensing rate has decreased annually since 2019.[55]  In fact,

---

[53] https://www.cdc.gov/overdose-prevention/about/index.html (last accessed 8/1/25).

[54] *Id.*

[55] https://www.cdc.gov/overdose-prevention/data-research/facts-stats/opioid-dispensing-rate-maps.html (last accessed 8/1/25).

in 2023, the overall drug overdose death rate for Hawai'i reached 19.5 deaths per 100,000 persons[56]—the highest rate recorded since the beginning of the opioid epidemic.

242.    In addition to thousands of costly emergency room visits, inpatient hospitalizations, and other emergency medical treatments, the injection of opioids has led to increased Hepatitis C infections.[57]  In 2016, 6,800 people in Hawai'i were estimated to have Hepatitis C, a rate of 610 cases per 100,000 persons.[58]

243.    Even infants and children have been harmed by opioid abuse. Although the rate of neonatal abstinence syndrome ("NAS"), also known as neonatal opioid withdrawal syndrome ("NOWS"), in Hawai'i remains one of the lowest in the country, infants continue to be born addicted to opioids due to prenatal exposure.

244.    The oversupply of opioids has also significantly injured older children. Those who use prescription opioids before high school graduation bear a 33% increased risk of later opioid misuse.[59]  Moreover, in 2017, one in four lesbian, gay and bisexual public high school students in Hawai'i reported using prescription drugs without a prescription.[60]

245.    The PBM Defendants' actions have also resulted in significant increases in crime and related criminal justice expenses.  Notably, of 21,564 arrests in the City & County of Honolulu

---

[56] https://www.hawaiihealthmatters.org (last accessed 8/1/25).

[57] https://health.hawaii.gov/substance-abuse/files/2013/05/The-Hawaii-Opioid-Initiative.pdf (last accessed 8/1/25).

[58] https://nida.nih.gov/sites/default/files/21954-hawaii-opioid-summary.pdf (last accessed 8/1/25).

[59] https://pubmed.ncbi.nlm.nih.gov/26504126/ (last accessed 8/1/25).

[60] https://health.hawaii.gov/substance-abuse/files/2013/05/The-Hawaii-Opioid-Initiative.pdf (last accessed 8/1/25).

in 2018, 56% involved individuals with symptoms of serious mental illness and/or severe substance intoxication.[61]

246.    While the PBM Defendants were reaping hundreds of millions of dollars in profits from their wrongful conduct, the State has had to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.  The State has incurred and continues to incur substantial costs because of Optum's and Express Scripts' conduct including, but not limited to, costs of: increased services with respect to law enforcement and first responders; county health facilities, including clinics; detention centers and jails; county courts, including drug courts; education programs; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention and education programs; inmate services, including housing, health and support staff; intervention programs; increased costs associated with its own employee benefits plan; repairing and restoring state infrastructure and services; and general societal and lost productivity costs.

247.    In fact, the CDC estimates that Hawaiʻi suffered an adverse economic impact in excess of $1 billion—*in 2017 alone*—related to opioid use disorder and fatal opioid overdoses.[62] The State has allocated or re-allocated extraordinary resources through staffing at departments providing all of the services listed above and has incurred substantial increases in overtime and related costs associated with educational and judicial support services.

---

[61]    https://health.hawaii.gov/opppd/files/2020/12/2021-ADAD-Leg-Report.pdf   (last   accessed 8/1/25).

[62] https://www.cdc.gov/mmwr/volumes/70/wr/mm7015a1.htm#F1_down (last accessed 8/1/25).

## V.    THE STATE'S CLAIMS ARE TIMELY.

248.    Statutes of limitations do not run against the State.[63] The Hawaiʻi Supreme Court recently made clear that this principle applies with equal force to UDAP claims.[64]

249.    Moreover, the PBM Defendants' wrongful conduct is still ongoing and has caused the State repeated injuries and/or a continuous injury over many years.

## VI.    CAUSES OF ACTION

### COUNT I

### VIOLATION OF HAWAIʻI LAW ON UNFAIR OR DECEPTIVE ACTS OR PRACTICES, HRS 480-1, *ET SEQ.*

250.    The State repeats, re-alleges, and incorporates by reference each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

251.    Hawaii's Unfair or Deceptive Acts or Practices statute ("UDAP") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."  HRS § 480-2(a).

252.    As set forth herein, the PBM Defendants' actions fit within the definitions and scope of the UDAP statute.

253.    To establish a violation of HRS § 480-2, "a plaintiff may show that an act or practice is deceptive *or* unfair."[65]

---

[63] HRS § 657-1.5.

[64]  *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 152 Hawaiʻi 418, 437-38, 526 P.3d 395, 414-15 (2023) (finding statute of limitations not applicable to the State's claim for violations of Hawaiʻi Unfair or Deceptive Acts or Practices statute).

[65] *Shikada*, 152 Hawaiʻi at 443, 526 P.3d at 420 (emphasis in original).

254.    A practice is "unfair" under UDAP if it "(1) offended established public policy, (2) was immoral, unethical, oppressive, unscrupulous, or (3) substantially injured Hawaiʻi consumers."[66] An act or omission is "deceptive" if it is a material statement or omission that is "likely" to mislead or deceive or has "the capacity or tendency" to mislead or deceive.[67] Unlike a claim for fraud, "actual deception need not be shown" in order to establish a violation under UDAP.[68] Whether a practice has the capacity to mislead requires the application of an objective "reasonable person" standard by the trier of fact and is "inappropriate" for summary disposition.[69]

255.    An act is also deceptive under UDAP if it is "(1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation, omission, or practice is material."[70]

256.    "A practice may be unfair [under UDAP] if it 'offends public policy as it has been established by statutes, the common law, or otherwise.'"[71]

257.    Among other things, an act or practice or material omission can also be "deceptive" under UDAP if a person:

(2)    Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

* * *

---

[66] *Id.*

[67] *State by Bronster v. United States Steel Corp.*, 82 Hawaiʻi 32, 50, 919 P.2d 294, 312 (1996); *Tokuhisa v. Cutter Mgmt. Co.*, 122 Hawaiʻi 181, 195, 223 P.3d 246, 260 (App. 2009), quoting *Bronster, supra.*; *see also Hungate v. Law Office of David B. Rosen*, 139 Hawaiʻi 394, 411, 391 P.3d 1, 18 (2017), *abrogated on other grounds* (regarding the disjunctive nature of the definition of UDAP "unfairness") in *Shikada, supra*.

[68] *Tokuhisa*, 122 Hawaiʻi at 194, 223 P.3d at 259.

[69] *Id.*

[70] *See, e.g., Shikada, supra*, 152 Hawaiʻi at 424, 526 P.3d at 401.

[71] *Hungate*, 139 Hawaiʻi at 411, 391 P.3d at 18.

(5)     Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have ...;

* * *

(7)     Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

* * *

(9)     Advertises goods or services with the intent not to sell them as advertised;

* * *

(12)    Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.[72]

258.    As alleged more fully herein, the PBM Defendants' conduct was both unfair and deceptive under UDAP.

259.    The PBM Defendants' unfair and deceptive acts or practices described above constitute multiple, separate violations of UDAP.

260.    As alleged more fully herein, the PBM Defendants violated UDAP through their misrepresentations, omissions, and unscrupulous, immoral, unethical and/or oppressive practices. The PBM Defendants have violated UDAP by, among other things:

(a)     Representing to their clients, patients, and the public that they would conduct concurrent drug utilization review to ensure only appropriate opioid prescriptions were filled, but failing to do so or to do so effectively;

(b)     Representing to their clients, patients, and the public that they would implement and use utilization management measures to ensure only appropriate opioid prescriptions were filled, while in reality not doing so;

(c)     Partnering in opioid manufacturers' unfair and deceptive marketing efforts;

(d)     Violating HUCSA and other applicable statutes and regulations in the operation of their mail order pharmacy businesses;

---

[72] HRS § 481A-3(a)(2), (5), (9), (12).

(e)     Representing to patients and the public that they prioritized their patients' safety in the operation of their mail order pharmacy businesses, while in reality failing to comply with their legal and professional obligations to fulfill their corresponding responsibility and perform adequate due diligence when filling opioid prescriptions;

(f)     Failing to disclose to patients and the public that they were not complying with their legal and professional obligations to fulfill their corresponding responsibility and perform adequate due diligence when filling opioid prescriptions;

(g)     Dispensing opioids to patients without fulfilling their corresponding responsibility or conducting due diligence, and without disclosing such failures, such that patients may have been misled to believe that any prescriptions filled were legitimate and appropriate;

(h)     Taking advantage of the diminished capacity of patients with opioid use disorder by dispensing opioids without fulfilling their corresponding responsibility and conducting appropriate due diligence;

(i)     Representing to clients, patients, and the public that they design their drug lists based on safety and efficacy, when in reality they design their lists to maximize their own profits; and

(j)     Pressuring clients to accept drug lists that permitted unfettered access to opioids while concealing the PBM Defendants' self-serving financial interest in doing so;

261.    The PBM Defendants' false and misleading acts, representations, omissions, or practices had the capacity or tendency to mislead or deceive and/or were likely to mislead or deceive Hawaiʻi healthcare providers and patients acting reasonably under the circumstances, and were made by the PBM Defendants in the context of their trade or commerce in and/or directed toward the State of Hawaiʻi.

262.    The PBM Defendants' deceptive acts, representations, and omissions were material because they involved information that would be important to consumers and likely to affect their choice of, or conduct regarding, the PBM Defendants' products and services. For example, among other things, the PBM Defendants downplayed the serious risks of opioids, including addiction, misled health plan members to believe that their practices and procedures

64

were driven by safety and efficacy, and failed to disclose to their health plan clients or health plan members that the PBM Defendants' actions were motivated by manufacturer payments.

263.    The PBM Defendants' acts and omissions, including by assisting the opioid manufacturers in their fraudulent marketing of opioids, misleading health plan clients and their members to believe that the PBM Defendants' services were designed to facilitate safe and effective access to prescriptions, and failing to disclose their financial incentive to promote unfettered access to opioids, were also unfair because they offended established public policy, were immoral, unethical, oppressive, and/or unscrupulous, and/or substantially injurious to Hawai'i consumers.

264.    The PBM Defendants knew and intended, or should have known, that their acts, representations, and material omissions were unfair, deceptive, and in violation of UDAP and other Hawai'i law.

265.    The PBM Defendants' actions were done in connection with their sale and dispensing of prescription opioids and in the regular conduct of their trade or business within Hawai'i, directly or indirectly affecting the people of the State of Hawai'i.

266.    The PBM Defendants' acts and omissions offended Hawai'i public policy as they prevented risks relating to the use of prescription opioids from being made apparent to consumers, for the PBM Defendants' own financial gain, while representing to their clients, patients and the public that their lists of available drugs were based on safety and efficacy.

267.    The PBM Defendants' actions were immoral, unethical, oppressive, and unscrupulous in that the PBM Defendants were aware that the purpose of maintaining effective anti-diversion controls was to protect the public from the harms that could occur if dangerous controlled substances were diverted, yet the PBM Defendants prioritized profits over safety.

268.    The PBM Defendants' practices were undertaken in order to maximize profits, without adequate regard for the devastating and substantial societal harms that resulted from unfettered access to opioids—harms that the PBM Defendants knew or should have known would result given, among other things, their position in the opioid distribution chain, their specialized knowledge, their unique access to relevant data, and their legal and professional obligations in the practice of pharmacy.

269.    With respect to the PBM Defendants' PBM and retail pharmacy businesses, in determining civil penalties, each opioid claim processed and each opioid prescription filled and/or refilled constitutes a separate violation of the UDAP statute because each was performed as part of the PBM Defendants' systematic dereliction of their duties to consumers and the Hawaiʻi public.

270.    The PBM Defendants' acts and omissions constitute deceptive and unfair acts or practices in violation of section 480-2.

271.    The PBM Defendants' UDAP violations justify penalties of up to $10,000 for each violation against each of them.

272.    The PBM Defendants, by their acts and omissions as described herein, were substantial factors in causing the State to suffer extraordinary expense in responding to the opioid crisis, and to suffer other extensive economic harm. Pursuant to HRS § 480-14(a), the State is entitled to an award of treble damages against the PBM Defendants for their wrongdoing.

273.    The Attorney General is authorized to seek such damages on behalf of the State under both HRS § 480-14(a) and 661-10.

## COUNT II

## <u>VIOLATION OF UDAP, FRAUD AGAINST ELDERS, HRS § 480-13.5</u>

274.    The State repeats, re-alleges, and incorporates by reference each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

275.    HRS § 480-13.5 provides that "[i]f a person commits a violation under section 480-2 which is *directed toward, targets, or injures an elder*, a court, in addition to any other civil penalty, may impose a civil penalty not to exceed $10,000 for each violation."  HRS § 480-13.5(a) (emphasis added).

276.    The PBM Defendants specifically targeted the elderly for increased use of prescription opioids, and partnered with opioid manufacturers to direct unfair and deceptive marketing and promotional activities toward encouraging more liberal prescription of opioid drugs to the elderly, including the elderly in Hawaiʻi.

277.    Given the highly dangerous nature of prescription opioids, the general vulnerability of the elderly patient population, and the serious nature and prolonged duration of the unfair and deceptive acts and practices alleged herein, an additional penalty of $10,000 is warranted for each unfair or deceptive act or practice that, in whole or in part, was directed toward or targeted the elderly.

278.    For each such unfair or deceptive act or practice, the additional penalty of $10,000 per violation should be imposed not only against each PBM Defendant who participated and/or contributed to the violation, but also separately against each related entity that had actual or constructive knowledge of the violation and stood to benefit from it.

67

## COUNT III

## PUBLIC NUISANCE

279.    The State repeats, re-alleges, and incorporates by reference each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

280.    "[T]he common law has always provided a remedy for a nuisance, either by way of an action for damages or an equitable action to restrain the continuance of the wrong, or both." *Marsland v. Pang*, 5 Haw. App. 463, 476, 701 P.2d 175, 186 (1985).

281.    "The suppression of nuisances injurious to the public health or morality is among the most important duties of a government." *Id.* at 477, 701 P.2d at 187.

282.    "A nuisance has been variously defined to mean 'that which unlawfully annoys or does damage to another, anything that works hurt, inconvenience, or damage, anything that annoys or disturbs one in the free use, possession, or enjoyment of his property or which renders its ordinary use or physical occupation uncomfortable, and anything wrongfully done or permitted which injures another in the enjoyment of his legal rights.'" *Littleton v. State*, 66 Haw. 55, 67, 656 P.2d 1336, 1344-45 (1982).

283.    A nuisance can be private, public, or both. *Territory v. Shuji Fujiwara*, 33 Haw. 428, 429-30 (1935). A "public nuisance" is one which "affects the rights enjoyed by citizens as a part of the public, that is, the right to which every citizen is entitled." *Id.* A "private nuisance" is one that affects a single individual or a determinate number of persons in the enjoyment of some private right not common to the public." *Id.*

284.    A public official may bring an action to abate a public nuisance. *Haynes v. Haas*, 146 Hawaiʻi 452, 460-61, 463 P.3d 1109, 1117-18 (2020) (adopting Restatement (Second) of Torts § 821C).

285.    The PBM Defendants, by their acts and omissions as described herein, were substantial factors in causing the aforementioned opioid crisis, and in so doing created a public nuisance of extraordinary proportions.

286.    As a result of this public nuisance, the State sustained extensive economic harm in addressing the crisis and will continue to sustain such harm in the future, including but not limited to the cost of abating the harm the PBM Defendants helped create.

287.    Hawaiʻi nuisance law and HRS §§ 661-10, 480-14(b), and 480-15 authorize the Attorney General to seek an award of damages and/or treble damages against the PBM Defendants, as well as injunctive relief.

288.    The State also seeks a judgment that the PBM Defendants fund the abatement of the ongoing public nuisance that the PBM Defendants have caused.

## COUNT IV

## UNJUST ENRICHMENT

289.    The State repeats, re-alleges, and incorporates by reference each and every allegation set forth in all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows:

290.    It is the public policy of the State of Hawaiʻi that wrongdoers should not be permitted to retain the benefits of their wrongful conduct.

291.    As a result of the PBM Defendants' wrongful conduct in their promotion, sale, distribution, and dispensing of opioids in violation of their duties to protect consumers and the general public, individuals and entities in Hawaiʻi conferred a benefit on the PBM Defendants in the form of the profits they obtained.

292.    The PBM Defendants knowingly accepted such profits, to which they were not entitled.

293.    The PBM Defendants' acceptance and retention of such profits under these circumstances was and is unjust and inequitable.

294.    One way to ensure that the PBM Defendants will not unjustly retain the benefits of their wrongdoing is to require they disgorge the profits they accrued as a result of that wrongdoing.

295.    The State brings its claim for disgorgement pursuant to HRS § 661-10 and the State's parens patriae authority in order to protect the well-being of its citizenry. If civil penalties, damages, treble damages, injunctive relief and other statutory remedies prove insufficient to provide complete justice, the remedy of disgorgement should be considered.

296.    The PBM Defendants have acted in such a way as to fail to control the supply of opioids and maintain effective controls against diversion, intending thereby to increase their profits at the expense of the safety of the State and its residents.

297.    The PBM Defendants have also made false, misleading, unfair, and deceptive representations and material omissions regarding prescription opioids, intending thereby to increase their profits at the expense of the safety of the State and its residents.

298.    The PBM Defendants' misconduct alleged in this case was ongoing and persistent for many years.

299.    As a matter of equity, the PBM Defendants should be required to disgorge their unjustly obtained profits from purchases of prescription opioids in Hawaiʻi.

## RELIEF

**WHEREFORE,** the State of Hawaiʻi, by and through its Attorney General, respectfully prays that this Court grant the following relief:

1.    The entry of Judgment in favor of the State in a final order against each of the PBM Defendants;

2.      An order enjoining the PBM Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it, from engaging in unfair or deceptive practices in violation of Hawai'i law and ordering temporary, preliminary or permanent injunction;

3.      A declaration that the acts and omissions of each PBM Defendant described in this Complaint constitute multiple, separate violations of UDAP;

4.      A declaration that each PBM Defendant's acts and omissions were a substantial factor in creating a public nuisance relating to opioid abuse and in causing substantial harm to the State and the public's rights;

5.      An award of civil penalties to the State of up to $10,000, per PBM Defendant, for each violation of the UDAP statute in which they participated, profited, or reasonably expected to profit or otherwise benefit, pursuant to HRS § 480-3.1, in amounts to be proved at trial;

6.      An award of additional civil penalties to the State of up to $10,000, per violation, per PBM Defendant, under HRS § 480-13.5, for each act or omission constituting a UDAP violation in which they participated, profited, or reasonably expected to profit or otherwise benefit, that was directed toward, targeted, or injured an elder, in amounts to be proved at trial;

7.      An award of damages to the State for past and future expenses and other economic losses suffered by the State in responding to and abating the public nuisance which the PBM Defendants helped legally cause, in amounts to be proved at trial;

8.      An award of treble damages pursuant to HRS § 480-14(a), and for expenses and other losses sustained by the State as a result the PBM Defendants' violations of Hawaii's UDAP statute, in amounts to be proved at trial;

71

9.  An order requiring the PBM Defendants to disgorge to the State all profits obtained as a result of opioid sales in Hawai'i, in amounts to be proved at trial;

10.  Granting the State:

    a.  Reasonable attorneys' fees and the costs of suit under HRS § 480-14(c);

    b.  Pre-judgment and post-judgment interest; and

    c.  All other relief as provided by law and/or as the Court deems appropriate and just.

The State asserts claims herein in excess of the minimum jurisdictional requirements of this Court.

DATED:  Honolulu, Hawai'i, September 5, 2025.

_/s/_ Patrick F. McTernan
L. RICHARD FRIED, JR.
PATRICK F. McTERNAN

Attorneys for Plaintiff

| **STATE OF HAWAIʻI**<br>**CIRCUIT COURT OF THE**<br>**FIRST CIRCUIT** | **SUMMONS**<br>TO ANSWER CIVIL COMPLAINT | CASE NUMBER |
|---|---|---|

| PLAINTIFF | VS. | DEFENDANT(S) |
|---|---|---|
| STATE OF HAWAIʻI, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL | | EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC; OPTUMRX., INC.; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC; and OPTUM HEALTH NETWORKS, INC. |

PLAINTIFF'S NAME & ADDRESS, TEL. NO.

L. RICHARD FRIED, JR.   0764-0
PATRICK F. MCTERNAN  4269-0
841 Bishop Street, Suite 501
Honolulu, Hawaiʻi 96813

**TO THE ABOVE-NAMED DEFENDANT(S)**

You are hereby summoned and required to file with the court and serve upon

L. Richard Fried, Jr. and Patrick F. McTernan

841 Bishop Street, Suite 501, Honolulu, HI  96813

_____ ,

plaintiff's attorney, whose address is stated above, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the date of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**THIS SUMMONS SHALL NOT BE PERSONALLY DELIVERED BETWEEN 10:00 P.M. AND 6:00 A.M. ON PREMISES NOT OPEN TO THE GENERAL PUBLIC, UNLESS A JUDGE OF THE ABOVE-ENTITLED COURT PERMITS, IN WRITING ON THIS SUMMONS, PERSONAL DELIVERY DURING THOSE HOURS.**

**A FAILURE TO OBEY THIS SUMMONS MAY RESULT IN AN ENTRY OF DEFAULT AND DEFAULT JUDGMENT AGAINST THE DISOBEYING PERSON OR PARTY.**

| The original document is filed in the Judiciary's electronic case management system which is accessible via eCourt Kokua at: http://www.courts.state.hi.us | **Effective Date of 28-Oct-2019**<br>**Signed by: /s/ Patsy Nakamoto**<br>**Clerk, 1st Circuit, State of Hawaiʻi** |  |
|---|---|---|

|  | In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require a reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU- Phone No. 808-539-4400, TTY 808-539-4853, FAX 539-4402, at least ten (10) working days prior to your hearing or appointment date. |
|---|---|

# Docket No. 2

**Form 2-A.**     **CIVIL INFORMATION SHEET**

| STATE OF HAWAIʻI<br>CIRCUIT COURT OF THE<br>First_____ CIRCUIT | **CIVIL INFORMATION SHEET** | **Electronically Filed**<br>**FIRST CIRCUIT**<br>**1CCV-25-0001484**<br>**05-SEP-2025**<br>**03:41 PM**<br>**Dkt. 2 CIS** |
|---|---|---|

**I (A). PLAINTIFF(S)**

STATE OF HAWAII ex rel. ANNE E. LOPEZ, ATTORNEY GENERAL

☐ Additional page(s) attached

**I (B). DEFENDANT(S)**

EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC;
MEDCO HEALTH SOLUTIONS, INC.;  ESI MAIL ORDER PROCESSING, INC.;
ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.;

☑ Additional page(s) attached

| **II.(A). PLAINTIFF'S(S') ATTORNEY (NAME/NUMBER)**<br>L. Richard Fried, Jr.  0764-0<br>Patrick F. McTernan  4269-0<br><br>☐ Additional page(s) attached | **II.(B). DEFENDANT'S (S') ATTORNEY (NAME/NUMBER)**<br><br><br><br>☐ Additional page(s) attached |
|---|---|

| **III.  NATURE OF SUIT** | **IV. ORIGIN** | **V. DEMAND** |
|---|---|---|
| ☐ Contract<br>☐ Motor Vehicle Tort<br>☐ Assault & Battery<br>☐ Construction Defects<br>☐ Medical Malpractice<br>☐ Legal Malpractice<br>☐ Product Liability<br>☐ Other Non-Vehicle Tort<br>☐ Condemnation<br>☐ Foreclosure<br>☐ Agreement of Sale Foreclosure<br>☐ Agency Appeal<br>☐ Declaratory Judgment<br>☑ Other Civil Action<br>☐ Environmental Court<br>☐ Asbestos<br>☐ Consumer Debt Collection<br>☐ Quiet Title | ☑ (A). Original Proceeding<br>☐ (B). Transfer from District Court CIV. NO. _____<br>☐ (C). Transfer from another Circuit CIV. NO. _____ | Damages, civil penalties +<br>_____ |

| **VI.  JURY DEMAND**<br><br>☐ YES<br>☑ NO | **VII. CLASS ACTION**<br><br>☐ YES<br>☑ NO | **VIII. REQUEST TO EXEMPT FROM ARBITRATION**<br>☑ YES<br>☐ NO |
|---|---|---|

**IX. RELATED CASE(S)**

JUDGE     Honorable Shirley M. Kawamura

CIVIL NUMBER     1CC191000862

_____

| DATE<br>September 5, 2025 | ATTORNEY NAME/PARTY NAME<br>Patrick F. McTernan | SIGNATURE |
|---|---|---|

RESERVED FOR COURT USE

CIVIL NO.

In accordance with the Americans with Disabilities Act, and other applicable state and federal laws, if you require reasonable accommodation for a disability, please contact the ADA Coordinator at the Circuit Court Administration Office on OAHU-Phone No. 808-539-4400, TTY 808-539-4853, FAX, 539-4402; MAUI-Phone No. 808-244-2929, FAX 808-244-2777; HAWAII-Phone No. 808-961-7424, TTY 808-961-7422, FAX 808-961-7411; KAUAI-Phone No. 808-482-2365, TTY 808-482-2533, FAX 808-482-2509, at least ten (10) working days prior to your hearing or appointment date.

*(Rev. 08/__/21)*

Civil Information Sheet
Additional page 1

I. (B). DEFENDANT(S)

EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION
SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.;
OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.;
OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC;
and OPTUM HEALTH NETWORKS, INC.

# Docket No. 6

**CRONIN, FRIED, SEKIYA,**
  **KEKINA & FAIRBANKS**
L. Richard Fried, Jr.      0764-0
Patrick F. McTernan      4269-0
510 Davies Pacific Center
841 Bishop Street
Honolulu, Hawaiʻi 96813
Telephone: (808) 524-1433
rfried@croninfried.com
pmcternan@croninfried.com

Attorneys for Plaintiff

Electronically Filed
FIRST CIRCUIT
1CCV-25-0001484
05-SEP-2025
03:51 PM
Dkt. 6 PRE

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAIʻI, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>           Plaintiff,<br><br>    vs.<br><br>EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC; and OPTUM HEALTH NETWORKS, INC.<br><br>           Defendants.<br>_____ | CIVIL NO. _____<br>(Other Civil Action)<br><br>REQUEST TO EXEMPT CASE FROM THE COURT ANNEXED ARBITRATION PROGRAM; EXHIBIT A |

REQUEST TO EXEMPT CASE FROM THE
COURT ANNEXED ARBITRATION PROGRAM

Plaintiff, by and through its attorneys, Cronin, Fried, Sekiya, Kekina & Fairbanks, hereby requests that the above-entitled matter be exempt from the Court Annexed Arbitration Program, as the probable jury award value, not reduced by the issue of liability, and exclusive of attorney's fees, interest and costs, is in excess of $150,000.00.

This request is made pursuant to Rule 8(A) of the Hawaii Arbitration Rules, as amended, and the summary of facts attached hereto as Exhibit A.

DATED:  Honolulu, Hawaii, September 5, 2025.


_/s/_ Patrick F. McTernan
L. RICHARD FRIED, JR.
PATRICK F. McTERNAN
Attorneys for Plaintiff

2

EXHIBIT A

Defendants are pharmacy benefit managers and affiliated companies who participated in the marketing, sale, and distribution of prescription opioids.  Defendants, through decades of unfair and deceptive conduct, created and perpetuated the opioid crisis that many now say is destroying the nation.  The State of Hawai'i, by its Attorney General Ann E. Lopez (hereinafter "State"), brings claims against these Defendants for more many years of unfair and deceptive acts or practices in promoting the overuse of opioid products in Hawai'i.  These claims are brought under Hawai'i Revised Statutes ("HRS") Chapter 480 (hereinafter "UDAP"), HRS § 661-10, the Hawai'i common law and equity, and other applicable Hawai'i law.

Remedies available to the State include, but are not limited to:  civil penalties of up to $10,000 per Defendant, per violation; additional civil penalties for acts and practices that were directed toward or targeted elders; an award of the expenses of abating the nuisance Defendants helped create and related costs; treble damages; an order compelling Defendants to disgorge all profits with which they have been unjustly enriched as a result their misconduct; declaratory and injunctive relief; attorneys' fees and costs of suit; interest allowed by law, including prejudgment interest at a rate of 10 percent per annum; and all other relief the Court deems appropriate.

Based on an ongoing pattern of misconduct by Defendants for at least the last two decades, during which time they willfully, wantonly, and recklessly jeopardized the life, health and safety of vast numbers of Hawai'i patients and other members of the public, the State anticipates a civil penalties award alone of tens or hundreds of millions of dollars.  Therefore, this matter clearly satisfies the threshold for exemption from court annexed arbitration.

3

# <u>Docket No. 12</u>

CADES SCHUTTE
A Limited Liability Law Partnership

| C. MICHAEL HEIHRE | 1307 |
| MICHI MOMOSE | 9777 |

1000 Bishop Street, Suite 1200
Honolulu, HI 96813
Telephone: (808) 521-9200
Fax: (808) 521-9210
Email: mheihre@cades.com
       mmomose@cades.com

Attorneys for Defendants
EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS
ADMINISTRATORS, LLC, MEDCO HEALTH
SOLUTIONS, INC., ESI MAIL ORDER
PROCESSING, INC., ESI MAIL PHARMACY
SERVICE, INC.; EXPRESS SCRIPTS PHARMACY,
INC., EVERNORTH HEALTH, INC., and EXPRESS
SCRIPTS SPECIALTY DISTRIBUTION SERVICES,
INC.

Electronically Filed
FIRST CIRCUIT
1CCV-25-0001484
30-SEP-2025
01:44 PM
Dkt. 12 PDOC

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAII, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL, | CIVIL NO. 1CCV-25-0001484 (KTM) (Other Civil Action) |
| Plaintiff, | **[PROPOSED] STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT; AND ORDER** |
| v. | |
| EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC and | Judge: Honorable Kevin T. Morikone No Trial Date Set. |

OPTUM HEALTH NETWORKS, INC.,

        Defendants.

**[PROPOSED] STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT; AND ORDER**

CADES SCHUTTE
A Limited Liability Law Partnership

| | |
|---|---|
| C. MICHAEL HEIHRE | 1307 |
| MICHI MOMOSE | 9777 |

1000 Bishop Street, Suite 1200
Honolulu, HI 96813
Telephone: (808) 521-9200
Fax: (808) 521-9210
Email: mheihre@cades.com
          mmomose@cades.com

Attorneys for Defendants
EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS
ADMINISTRATORS, LLC, MEDCO HEALTH
SOLUTIONS, INC., ESI MAIL ORDER
PROCESSING, INC., ESI MAIL PHARMACY
SERVICE, INC.; EXPRESS SCRIPTS PHARMACY,
INC., EVERNORTH HEALTH, INC., and EXPRESS
SCRIPTS SPECIALTY DISTRIBUTION SERVICES,
INC.

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAII, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL, <br><br>          Plaintiff, <br><br>     v. <br><br> EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC and | CIVIL NO. 1CCV-25-0001484 (KTM) (Other Civil Action) <br><br> **STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT; AND ORDER** <br><br><br><br><br><br><br><br><br><br><br><br><br><br> Judge: Honorable Kevin T. Morikone <br> No Trial Date Set. |

OPTUM HEALTH NETWORKS, INC.,

Defendants.

## STIPULATION FOR EXTENSION OF TIME
## TO RESPOND TO COMPLAINT; AND ORDER

WHEREAS, pursuant to Hawaii Rule of Civil Procedure 6(b), Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc., Express Scripts Specialty Distribution Services, Inc., UnitedHealth Group Incorporated, Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., OptumHealth Care Solutions, LLC, OptumHealth Holdings, LLC, and Optum Health Networks, Inc. (collectively, "**Defendants**"), and Plaintiff State of Hawai'i *ex rel.* Anne E. Lopez, Attorney General ("**Plaintiff**," and together with Defendants, the "**Parties**"), hereby stipulate to extend the time for all Defendants to answer or otherwise respond to Plaintiff's Complaint, from October 14, 2025, to November 13, 2025.

WHEREAS, Defendants have agreed with Plaintiff that service of Plaintiff's Complaint shall be deemed effective as of September 24, 2025, and accordingly, Defendants' deadline to respond to Plaintiff's Complaint is October 14, 2025.

WHEREAS, the Parties may extend the time for Defendants to respond to Plaintiff's Complaint, and there is good cause here given the complexity of the issues and for judicial economy and efficiency.

WHEREAS, this is the first stipulated extension of time for Defendants to respond to Plaintiff's Complaint.

WHEREAS, the Parties recognize that the Court may not be able to so order the below stipulation before Defendants' current deadline to respond to the Complaint, and the Parties

2

therefore agree to abide by the terms of this stipulation irrespective of whether the Court is able to act before that time;

WHEREAS, this stipulation does not operate as an admission of any factual allegation or legal conclusion and is submitted subject to and without waiver of any right, defense, affirmative defense, claim, or objection, including lack of subject matter jurisdiction, or lack of personal jurisdiction, insufficient process, or insufficient service of process.

NOW, THEREFORE, IT IS STIPULATED AND AGREED that Defendants' deadlines to answer or otherwise respond to Plaintiff's Complaint is extended to November 13, 2025.

DATED:  Honolulu, Hawaiʻi, September 30, 2025.


CADES SCHUTTE
A Limited Liability Law Partnership


*/s/ C. Michael Heihre*
C. MICHAEL HEIHRE
MICHI MOMOSE

Attorneys for Defendants
EXPRESS SCRIPTS, INC., EXPRESS
SCRIPTS ADMINISTRATORS, LLC,
MEDCO HEALTH SOLUTIONS, INC., ESI
MAIL ORDER PROCESSING, INC., ESI
MAIL PHARMACY SERVICE, INC.;
EXPRESS SCRIPTS PHARMACY, INC.,
EVERNORTH HEALTH, INC., and
EXPRESS SCRIPTS SPECIALTY
DISTRIBUTION SERVICES, INC.

CRONIN, FRIED, SEKIYA, KEKINA &
FAIRBANKS


*/s/ Patrick F. McTernan*
_____
L. RICHARD FRIED, JR.
PATRICK F. McTERNAN

Attorneys for Plaintiff
STATE OF HAWAI'I, EX REL. ANNE E.
LOPEZ, ATTORNEY GENERAL


TOKIOKA SMITH, A Limited Liability Law
Company


*/s/ Jesse J. T. Smith*
_____
JESSE J. T. SMITH
JAIME H. TOKIOKA

Attorneys for Defendants
UNITEDHEALTH GROUP
INCORPORATED, OPTUM, INC.,
OPTUMINSIGHT, INC., OPTUMINSIGHT
LIFE SCIENCES, INC., OPTUMRX, INC.,
OPTUMHEALTH CARE SOLUTIONS, LLC,
OPTUMHEALTH HOLDINGS, LLC, and
OPTUM HEALTH NETWORKS, INC.


**APPROVED AND SO ORDERED:**


_____
**JUDGE OF THE ABOVE-ENTITLED COURT**


_____
*State of Hawai'i, ex rel. Anne E. Lopez, Attorney General v. Express Scripts, Inc., et al*; Civil No. 1CCV-25-0001484; Circuit Court of the First Circuit; State of Hawai'i; **STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT; AND ORDER**

# **<u>Docket No. 14</u>**

CADES SCHUTTE
A Limited Liability Law Partnership

C. MICHAEL HEIHRE                1307
MICHI MOMOSE                     9777
1000 Bishop Street, Suite 1200
Honolulu, HI 96813
Telephone: (808) 521-9200
Fax: (808) 521-9210
Email: mheihre@cades.com
        mmomose@cades.com

Attorneys for Defendants
EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS
ADMINISTRATORS, LLC, MEDCO HEALTH
SOLUTIONS, INC., ESI MAIL ORDER
PROCESSING, INC., ESI MAIL PHARMACY
SERVICE, INC.; EXPRESS SCRIPTS PHARMACY,
INC., EVERNORTH HEALTH, INC., and EXPRESS
SCRIPTS SPECIALTY DISTRIBUTION SERVICES,
INC.

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-25-0001484**
**02-OCT-2025**
**04:04 PM**
**Dkt. 14 STIP**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAII, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>Plaintiff,<br><br>v.<br><br>EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL ORDER PROCESSING, INC.; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMINSIGHT, INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; OPTUMRX, INC.; OPTUMHEALTH CARE SOLUTIONS, LLC; OPTUMHEALTH HOLDINGS, LLC and | CIVIL NO. 1CCV-25-0001484 (KTM)<br>(Other Civil Action)<br><br>**STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT; AND ORDER**<br><br><br><br><br><br><br><br><br><br>Judge: Honorable Kevin T. Morikone<br>No Trial Date Set. |

OPTUM HEALTH NETWORKS, INC.,

        Defendants.

## STIPULATION FOR EXTENSION OF TIME
## TO RESPOND TO COMPLAINT; AND ORDER

WHEREAS, pursuant to Hawaii Rule of Civil Procedure 6(b), Defendants Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Order Processing, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Evernorth Health, Inc., Express Scripts Specialty Distribution Services, Inc., UnitedHealth Group Incorporated, Optum, Inc., OptumInsight, Inc., OptumInsight Life Sciences, Inc., OptumRx, Inc., OptumHealth Care Solutions, LLC, OptumHealth Holdings, LLC, and Optum Health Networks, Inc. (collectively, "**Defendants**"), and Plaintiff State of Hawaiʻi *ex rel.* Anne E. Lopez, Attorney General ("**Plaintiff**," and together with Defendants, the "**Parties**"), hereby stipulate to extend the time for all Defendants to answer or otherwise respond to Plaintiff's Complaint, from October 14, 2025, to November 13, 2025.

WHEREAS, Defendants have agreed with Plaintiff that service of Plaintiff's Complaint shall be deemed effective as of September 24, 2025, and accordingly, Defendants' deadline to respond to Plaintiff's Complaint is October 14, 2025.

WHEREAS, the Parties may extend the time for Defendants to respond to Plaintiff's Complaint, and there is good cause here given the complexity of the issues and for judicial economy and efficiency.

WHEREAS, this is the first stipulated extension of time for Defendants to respond to Plaintiff's Complaint.

WHEREAS, the Parties recognize that the Court may not be able to so order the below stipulation before Defendants' current deadline to respond to the Complaint, and the Parties

therefore agree to abide by the terms of this stipulation irrespective of whether the Court is able to act before that time;

WHEREAS, this stipulation does not operate as an admission of any factual allegation or legal conclusion and is submitted subject to and without waiver of any right, defense, affirmative defense, claim, or objection, including lack of subject matter jurisdiction, or lack of personal jurisdiction, insufficient process, or insufficient service of process.

NOW, THEREFORE, IT IS STIPULATED AND AGREED that Defendants' deadlines to answer or otherwise respond to Plaintiff's Complaint is extended to November 13, 2025.

DATED:  Honolulu, Hawai'i, September 30, 2025.


CADES SCHUTTE
A Limited Liability Law Partnership


*/s/ C. Michael Heihre*
C. MICHAEL HEIHRE
MICHI MOMOSE

Attorneys for Defendants
EXPRESS SCRIPTS, INC., EXPRESS
SCRIPTS ADMINISTRATORS, LLC,
MEDCO HEALTH SOLUTIONS, INC., ESI
MAIL ORDER PROCESSING, INC., ESI
MAIL PHARMACY SERVICE, INC.;
EXPRESS SCRIPTS PHARMACY, INC.,
EVERNORTH HEALTH, INC., and
EXPRESS SCRIPTS SPECIALTY
DISTRIBUTION SERVICES, INC.

CRONIN, FRIED, SEKIYA, KEKINA & FAIRBANKS


/s/ Patrick F. McTernan
L. RICHARD FRIED, JR.
PATRICK F. McTERNAN

Attorneys for Plaintiff
STATE OF HAWAIʻI, EX REL. ANNE E. LOPEZ, ATTORNEY GENERAL


TOKIOKA SMITH, A Limited Liability Law Company


/s/ Jesse J. T. Smith
JESSE J. T. SMITH
JAIME H. TOKIOKA

Attorneys for Defendants
UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., OPTUMINSIGHT, INC., OPTUMINSIGHT LIFE SCIENCES, INC., OPTUMRX, INC., OPTUMHEALTH CARE SOLUTIONS, LLC, OPTUMHEALTH HOLDINGS, LLC, and OPTUM HEALTH NETWORKS, INC.


**APPROVED AND SO ORDERED:**


/s/ Kevin T. Morikone

**JUDGE OF THE ABOVE-ENTITLED COURT**


*State of Hawaiʻi, ex rel. Anne E. Lopez, Attorney General v. Express Scripts, Inc., et al*; Civil No. 1CCV-25-0001484; Circuit Court of the First Circuit; State of Hawaiʻi; **STIPULATION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT; AND ORDER**